**In re MID REGION PETROLEUM, INC., Debtor.**

**Bankruptcy No. 83–01871–W.**

United States Bankruptcy Court, N.D. Oklahoma.

March 15, 1990.

ors are directed to respond in writing by a date certain or be dismissed; any response by debtors which satisfies the Court that Chapter 7 relief is proper results in withdrawal of the order to show cause without formal hearing; any response by debtors which does not satisfy

Ann C. Hinnant, Richards, Paul, Richards & Siegel, Tulsa, Okl., for General American Transp. Corp.

William C. Kellough, Tulsa, Okl., for trustee.

ORDER GRANTING TRUSTEE'S OBJECTION TO PROOF OF CLAIM OF GENERAL AMERICAN TRANSPORTATION CORPORATION

MICKEY DAN WILSON, Bankruptcy Judge.

The Trustee's Objection to General American Transportation Corporation's Claim of an Administrative Expense was submitted for decision on stipulations and

the Court that Chapter 7 relief is proper is set for hearing, and only thereafter may dismissal ensue. The Court hopes that motions by the Assistant United States Trustee will largely replace the Court's own orders to show cause.

briefs. Upon consideration thereof, and of the record herein, the Court, pursuant to Bankruptcy Rules 9014 and 7052, finds, concludes, and orders as follows.

## FINDINGS OF FACT

The parties stipulate, and the Court finds, as follows:

"1. On or about March 15, 1977, February 20, 1979 and October 10, 1979, General American Transportation Corporation (GATX), as lessor, entered into various lease agreements (Nos. 1016, 9621, and 7986, respectively) with Mid–Region Petroleum, Inc., the debtor in the case (Debtor), as lessee, involving seventy railcars. The lease agreements placed the following obligations on the Debtor/Lessee:

 a. Service charges per car per month of $380.00 for forty cars under Lease No. 1016; $330.00 for ten cars under Lease No. 9621; and $511.50 for twenty cars under Lease No. 7986;

 b. Upon expiration or termination of the leases, Lessee was to promptly return each car to GATX;

 c. Lessee was to be liable to GATX for all accrued charges under the contract and no termination of agreement was to affect or modify any right or claim which accrued prior to the termination;

 d. Lessee was to use the cars exclusively in lessee service and in the service of its subsidiaries and affiliates. Unless Lessee obtained GATX's prior written consent, it could not transfer or assign the agreement or any car.

"2. On December 23, 1983, the Debtor commenced this case by filing a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. Section 101 et seq.

"3. Following commencement of the case, the Debtor retained possession of the seventy leased railcars.

"4. In March 5, 1984, W. Scott Martin was appointed to serve as trustee ['the Trustee'].

"5. On or about May 15, 1984, the Trustee sent a letter to GATX stating that Lease Agreements, 1016, 7986, and 9621 were cancelled. Following this letter neither the Trustee nor GATX took any further action to return the cars to the possession of GATX until after July 24, 1984.

"6. On June 20, 1984, the Trustee filed a motion seeking authorization to reject various executory contracts with GATX, including the lease agreements in question.

"7. On July 24, 1984, this Court entered an order rejecting the aforesaid leases with GATX.

"8. None of the railcars were returned to the possession of GATX prior to July 24, 1984.

"9. The Trustee did not use any GATX railcars at any time for the transaction of Mid–Region business or otherwise.

"10. On August 15, 1988, GATX filed a First Amended Proof of Claim seeking $240,234.67 as an unsecured claim and an Administrative Proof of Claim seeking $112,547.36. Mathematical errors were made when calculating the figures for said proofs of claim. The correct amount of the First Amended Proof of Claim is $222,-397.58 and of the Administrative Claim is $176,062.34. The Trustee's attorney was immediately notified of the scrivener's error and has consented to the correction of the amounts claimed and has consented to the correction of the amounts claimed (reserving its prior objections to the Administrative Claim).

"11. The Trustee has filed no objection to the First Amended Proof of Claim, thereby entitling GATX to its unsecured claim for $222,397.58.

"12. The Administrative Claim is based on the rental payments due and owing to GATX from the commencement of the case on December 23, 1983, to the date of the entry of the rejection order on July 24, 1984.

"13. The Trustee filed an amended and Restated Motion and Notice of Acceptance and Objection of Claims on September 25, 1989. In particular, the Trustee seeks disallowance of GATX's Administrative Claim on the ground that GATX performed no

services and incurred no expenses post-petition which benefited the estate," Stipulation pp. 1–3.

Any Conclusions of Law which ought more properly to be Findings of Fact are adopted and incorporated herein by reference.

## CONCLUSIONS OF LAW

According to the parties,

"The legal issues to be decided by this Court are as follows:

1. Whether GATX is entitled to administrative rent due to the retention by the estate of the railcars post-petition, without regard to the actual use of said railcars by the estate or benefit to the estate from its retention of the railcars?

2. If GATX is entitled to administrative rent, during what time period is the rent awardable?

3. If GATX is entitled to administrative rent, what should be the rental rate?"

Stipulation p. 4. The Court determines these issues under the Bankruptcy Code as it existed before the Bankruptcy Amendments and Federal Judgeships Act of 1984 took effect in July–October 1984.

On April 3, 1987, this Court issued its "Order Disallowing Administrative Claim of Union Tank Car Company," which said order "hereby denies in total the Applicant's request for an administrative claim relating both to rental of tank cars and cleaning expenses of the same," and further determined "that the lease between Mid–Region Petroleum, Inc. and Applicant be deemed rejected on May 15, 1984, the date of written notification by Trustee, W. Scott Martin," but "without prejudice to Applicant in presenting any pre-petition claim." Although "GATX is aware of [this] decision ... GATX requests that the Court reconsider that decision in light of what GATX believes to be the higher and more persuasive line of authority," GATX "Opening Brief." p. 6.

 GATX concedes that its leases of cars to Debtor were executory contracts as of the commencement of Debtor's Chapter 11 case; and that said executory contracts were rejected. GATX presumes that the effective date of rejection was the date the Court formally authorized rejection, i.e. July 24, 1984. Rejection may be accomplished by unequivocal act of the Trustee, *In re 1 Potato 2, Inc.*, 58 B.R. 752 (B.C., D.Minn.1986), *In re By–Rite Distributing, Inc.*, 55 B.R. 740 (D.Utah 1985), *In re Bon Ton Restaurant and Pastry Shop, Inc.*, 52 B.R. 850 (B.C., N.D.Ill.1985), *In re Ro–An Food Enterprises Ltd.*, 41 B.R. 416 (E.D.N.Y.1984), even though court approval must subsequently be sought by motion, Bankruptcy Rule 6006, and indeed GATX makes no argument on behalf of its assumption to the contrary. In this instance, as in the Union Tank Car matter, the Court concludes that the effective date of rejection was the date the Trustee gave unequivocal notice to GATX of his intent to reject, i.e., May 15, 1984. This date, May 15, 1984, is the termination date of any possible claim of GATX to "administrative rent" under the leases.

As an executory contract, the leases could be assumed or rejected by Debtor or Debtor's Trustee at any time before confirmation of a plan, 11 U.S.C. § 365(d)(2). The Bankruptcy Code specifically provides that

A claim arising from the rejection, under Section 365 of this Title or under a plan under chapter 9, 11, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition,

11 U.S.C. § 502(g). GATX has filed a general unsecured claim for pre-petition debts and for what GATX considers to be damages "arising from the rejection" of its leases, i.e., the cost of retrieval of leased cars. GATX did not include unpaid post-petition rent as a part of its claim "arising from the rejection" of its leases, but assigned such post-petition rent separate status as "administrative rent" and filed a

separate, administrative-priority claim therefor. The former claim is not objected to; the latter claim is what concerns us here.

If Debtor or Trustee had assumed the leases, any default must be cured, and so any accrued post-petition rent must be paid at the contract rate, as required by 11 U.S.C. § 365(b)(1)(A). No obligation to pay accrued post-petition rent as "cure of default" arises if the leases are rejected. Thus it appears that accrued but unpaid post-petition rent is "[a] claim arising from the rejection" of a lease, and must be treated as just another prepetition general unsecured claim pursuant to 11 U.S.C. § 502(g). GATX attempts to promote this general unsecured claim to administrative expense status. Administrative expenses are a specially favored type of post-petition claim, given priority in distribution over most other claims against assets of a bankruptcy estate, 11 U.S.C. § 503, § 507(a)(1). For purposes of this opinion, this Court will assume that there is a conflict between 11 U.S.C. § 502(g) on the one hand and 11 U.S.C. § 503, § 507(a)(1) on the other hand, regarding the treatment of post-petition rent on a rejected lease; and that, notwithstanding 11 U.S.C. § 502(g), administrative expense priority under 11 U.S.C. § 503, § 507(a)(1) *may* be given to post-petition rent on a rejected lease—to some extent, and under the proper circumstances. See *In re Dixie Fuels, Inc.*, 52 B.R. 26 (B.C., N.D.Ala.1985) citing *In re Airlift International, Inc.: GATX Leasing Corp. v. Airlift International, Inc.*, 761 F.2d 1503, 1508–1509 (11th Cir.1985). The question is to what extent, and under what circumstances, post-petition rent on a rejected lease may rise to the dignity of an administrative expense under 11 U.S.C. § 503.

 The burden is on GATX to show its entitlement to an administrative expense priority, *In re Butcher*, 108 B.R. 634 (B.C., E.D. Tenn.1989), *In re Gillette Associates, Ltd.*, 101 B.R. 866 (B.C., N.D.Ohio 1989), *Matter of Patch Graphics*, 58 B.R. 743 (B.C., W.D.Wis.1986). There is no evidence before this Court that Debtor or Trustee ever made any use whatever of any of GATX's cars at any time after commencement of the Chapter 11 case on December 23, 1983.

GATX makes free use of the term "administrative rent." The term does not occur in the Bankruptcy Code. No specific provision is made in 11 U.S.C. § 503 for allowance of post-petition rent on a rejected lease as a proper administrative expense. If post-petition rent on a rejected lease is to be treated as an administrative expense, it must fit within one of the recognized or permissible categories of administrative expenses. None of the types of administrative expenses set forth in 11 U.S.C. § 503 could plausibly apply to post-petition rent under a rejected lease except 11 U.S.C. § 503(b)(1)(A), which grants administrative expense status to

> ... the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case ...

Therefore (where, as here, the 1984 amendments to 11 U.S.C. § 365(d) do not apply) post-petition rent under a rejected lease may be treated as an administrative expense if, or to the extent that, it is an actual, necessary cost of preserving the estate.

Debtor and Trustee retained possession of GATX's leased cars for more than four months before rejection of the leases. If GATX had retrieved its cars sooner, it might have re-leased them to another paying customer. This might be referred to as the cars' "occupancy cost" to GATX. But the occupancy cost *to the lessor* has absolutely nothing to do with preserving the bankruptcy estate *of the lessee*. Here, nothing indicates that Debtor's retention of these cars had the slightest effect on "preserving the estate." Nothing indicates that Debtor's retention of these cars was "necessary" for any purpose whatever. Under these circumstances, the most basic requirement of administrative expense priority status—namely, some ascertainable role in "preserving the estate"—does not appear. GATX claims administrative expense priority on the basis of *loss to*

*GATX,* not on the basis of *benefit to the bankruptcy estate.* But nothing in the Bankruptcy Code warrants administrative expense priority on the sole basis of creditor loss. There are many creditors in this case, and where assets are not sufficient to pay all debts, many creditors will suffer loss. "Reorganization, in its fundamental aspects, involves the thankless task of determining who should share the losses incurred by an unsuccessful business and how the values of the estate should be apportioned among creditors ...," S.Rep. No. 95–989 (1978) p. 10, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5796. GATX must establish some basis other than mere loss for the special treatment it craves; after all, to the extent GATX's losses are mitigated by giving it an administrative expense priority, other creditors' losses will be aggravated.

GATX proposes that the benefit to the estate was GATX's own quiet acquiescence in the estate's retention of the leased cars, sparing the estate the trouble and expense of responding to demands for acceptance or rejection of the leases early in the case. In effect, GATX says that its silence, sparing the estate a few hundred dollars at most in attorney fees while causing the estate to incur $176,062.34 in "administrative rent," tends to "preserve the estate." If this is preservation, this Court wonders what waste would look like.

GATX appeals to "equity," asserting that Debtor and Trustee unfairly deprived GATX of the use of its leased cars by neglecting to accept or reject the leases during an extended period of time. But Debtor's and Trustee's inaction did not deprive GATX of anything. GATX could have moved at any time after commencement of the case to require Debtor or Trustee to accept or reject within a specified period, 11 U.S.C. § 365(d)(2), thereby mitigating its own losses. GATX did not bother to do so. GATX claims it was deterred by "transaction cost," GATX "Reply Brief" p. 4—in effect, GATX says that pushing one or two simple motions through this Court was a burden comparable to GATX's occupancy cost of over $176,000. This is the converse of GATX's "preservation of the estate" argument, and is equally difficult to credit. The fact is that GATX slept on its own rights herein; and now wants an administrative expense priority of over $176,000 taken from the pockets of other creditors as a reward for GATX's own laches. If this contest were between GATX and a solvent Debtor, this Court's sympathies might incline toward GATX. But the real contest herein is between GATX and the general creditors of this bankruptcy estate; and those other creditors, as a group, are entirely innocent. Under such circumstances, the equities of the matter do not favor GATX.

GATX offers *Kneeland v. American Loan & Trust Co.,* 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379 (1890) as "controlling authority" and "binding Supreme Court precedent" which "mandate[s] allowance of GATX's administrative rent claim," GATX "Reply Brief" p. 1. This 1890 case somewhat antedates the Bankruptcy Code of 1978 (in fact, it even antedates the Code's predecessor, the Bankruptcy Act of 1898) and so cannot "mandate" anything in contradiction of 11 U.S.C. § 502(g), § 503. It is not even a bankruptcy case, but deals with equity receivership and foreclosure sale of a railroad. There were two different receiverships in the case: first, a receivership instigated by a judgment creditor, lasting from August 1 to December 1, 1883; and second, a receivership instigated by trustees under real estate mortgages, from December 1, 1883 forward. The first receivership was for the purpose of reaching surplus earnings of the railroad and applying them to the judgment debt; the second receivership was for the purpose of foreclosing mortgages on railroad real estate, though in the course of the latter receivership the railroad's personalty was seized and disposed of as well. The railroad's personalty included "leased" railroad cars—although the "lease" was intended as security and the "lessor" in effect had a lien on the railroad rolling stock. The railroad having been liquidated, the question was how the proceeds should be divided, and in particular whether "rent" on the rolling stock accrued during the

receiverships should be charged against the real estate mortgagees and in favor of the "lessor" or lien-holder of the rolling stock. The Supreme Court held that rent should *not* be charged against the real estate mortgagees for the period of the first receivership, but only for the period of the second receivership. The Supreme Court observed,

The first bills under which the receiver was appointed were filed August 1, 1883, by a judgment creditor. The trustees in the several mortgages were made parties to these bills. They entered their appearance, and, neither objecting nor consenting, the receiver was appointed. Such receivership was continued four months and until December 1, 1883 ... The first inquiry presented is whether rentals for such period were properly given priority over the mortgage debts. That question must be answered in the negative. It is important to note these facts: First. This case is not embarrassed by any matter of surplus earnings, for it appears beyond any possibility of doubt, that from the time of the purchase of this rolling stock to the time of the final disposition of these cases the receipts did not equal the operating expense ... Second. The receivership was at the instance of a judgment creditor, and was with a view of reaching the surplus earnings for the satisfaction of his debt. It was not at the instance of mortgagees, nor were they seeking foreclosure of their mortgages. They were asking nothing at the hands of the court. They were not asking it to take charge of the property, or thus impliedly consenting to its management of the property for their benefit. Third. This rolling stock was not included in the sale, but was returned to the interveners upon orders entered prior to the decree of sale. So that only that property was sold which was covered by mortgages executed prior to any contract with the interveners with respect to rolling stock, and it is the proceeds of this sale which the interveners are seeking to appropriate. They cannot say that their property was sold, or that by such fact they have an interest in the proceeds of sale. Fourth. The sale realized only a small proportion of the mortgage debts. There was no surplus above the mortgages for distribution to the interveners or among general creditors. In fact, only a small fraction of the mortgage debt was realized. Fifth. During these four months no demand for possession or rental was made of the receiver by any of the interveners, or any one for them ...

... the question is asked, may a court, through its receiver, take possession of property and pay no rental for it? If it may legitimately compel the operation of the railroad in the hands of its receiver, in order to discharge the obligations of the company to the public, may it not also, and must it not also, burden that receivership, and the property in charge of the receiver, with all the expenses connected with the operation of the road, together with reasonable rentals for the property used and necessary for the operation of the road? As to the general answer to these inquiries, we have no doubt. A court which appoints a receiver acquires, by virtue of that appointment, certain rights and assumes certain obligations, and the expenses which the court creates in discharge of those obligations are burdens necessarily on the property taken possession of, ...

But as against this we are confronted with these facts: The court never made any order for the rental of this rolling stock, and the situation of all the parties during this four months receivership was this: The railroad company ... was in equity, whatever may have been the location of the legal title, the owner of realty, subject to certain fixed mortgage indebtedness, and of personalty, the rolling stock in question, subject to certain fixed liens. The creation, in the first instance, of those liens gave to neither lienholder, as against the other, priority in payment otherwise than in respect to the property specially charged with those liens ... Under those circumstances, neither the holder of the lien on the real or the personal property moving in the premises, a general creditor of the common

debtor invoked for the payment of his debt the intervention of a court of equity and the possession of all the property charged with these two liens and its operation with a view to the collection of his unsecured claim. The operation of the road during that receivership did not pay the operating expenses ... If the operation of the property seized by the receiver did not result in the payment of the operating expenses, and the common debtor was unable to pay, the burden of the deficiency is as properly cast upon the holder of a lien upon the personalty as upon the holder of a lien upon the realty; and when the court, in the administration of the receivership, thereafter returns the personalty to the holder of the liens upon it, such lien-holder must be content to be relieved from any burden for a *pro rata* share of the deficiency, and has no equity to claim that he shall be not only thus relieved, but that he may also charge upon the realty, to the detriment of the lien-holder thereof, both the entire burden of the deficiency and compensation to him for the use of his property. Hence it follows that neither by reason of a contract of purchase of the rolling stock, nor by its use for four months at the instance of a general creditor, was any burden cast upon the holder of a lien upon the real estate for the non-payment of such contract price or the rental value. The court therefore erred in charging rental value of the rolling stock during those four months as a prior lien upon the realty.

On the 1st of December, 1883, however, the situation was changed. At that time the mortgagees upon the realty commenced suits to foreclose their mortgages, and at their instance, a receiver was appointed for all the property, both real and personal ... In the latter it had a remote interest, though subordinate to existing liens. The court, responding to its demands, takes possession of all the property, real and personal. Now, when the holder of a first lien upon the realty alone asks the court of chancery to take possession, not only of the real but also of personal property used for the benefit

of the real, that application is a consent on its part that the rental value of the personalty thus taken possession of and operated for the benefit of the realty shall be paid in preference to its own claim ... The application may not be a consent that the contract price of the personalty shall be paid in preference to his lien; but it certainly is a consent that the rental value of that personalty, during the time of the possession by the receiver appointed at his instance, may have priority to his claim. If the holder of a lien upon the realty does not think that the continued possession of the personalty is a benefit to his lien, he should simply omit the personalty from his bill, and ask the court to take possession of the realty alone. But either because he believed that the possession of the personalty was necessary for the operation of the railroad, and the security of his claim; or else because, by virtue of his secondary right, he expected to pay for the personalty and retain both the personalty and the realty, he has had the court take possession of both by its receiver, and by that act, although subsequently the personalty was returned to the holder of the lien upon it, be consented to the payment of reasonable rental pending the receiver's possession.... under the circumstances reasonable rental value was properly allowed as a prior claim to the mortgage indebtedness. Indeed, we do not understand that counsel for appellant seriously contest this proposition. Their contention substantially is, that the basis of such rental value was wrong; that the rental should only be on the basis of actual use—the "mileage system," as it is known in railroad parlance; that, in fact, the railroad company had acquired too much rolling stock, and so, averaging it, the mileage was quite small; whereas the master, as approved by the court, fixed the rental not at actual mileage, but at a reasonable value irrespective of the actual use. We think that the decision of the court was right. The initiative in the matter was taken by the trustees. They asked, by their bill, that the court take possession of all the

personalty. If more was taken possession of than was needed, it was their mistake. The court is not to be assumed to be an experienced railroad manager, knowing exactly the amount of rolling stock needed for the operation of the road. It may justly assume that what had been contracted for was necessary, and if the trustees ask that all may be taken possession of, it may act upon that as a declaration that all is necessary, and that rental value is to be paid for all. ... the taking possession of all the property they name is in reliance upon their representation that all is needed for the operation of the railroad, and that they consent either to the payment of the unpaid purchase price of any property thus taken possession of, or a reasonable rental for the use of the same ... The court is ignorant of the history of the enterprise; it sustains the application and appoints a receiver, and the rolling stock is taken possession of by that receiver. Can it be held that such possession, taken at the instance of the trustee, casts no burden on the road, either for purchase price or rental prior to the claim of the original mortgage? Can the trustee, forcibly, through the power of a court, compel an appropriation of this rolling stock for the benefit of the property subject to its lien without compensation? Does not its application for possession carry with it an assent that rental for such rolling stock shall be first paid, as one of the expenses of the receivership which it has invoked? But one answer can be made to this inquiry, and that is that its application is a consent to the payment of reasonable rental during the possession of the receiver—a rental not based upon the use actually made by the receiver, but on the ordinary value of the rental of such property. So, although it may be true, ... that more was taken possession of than was needed, and that there was only a limited use of each car and engine, yet the case is to be taken as though all use made of all; ...,

*Kneeland v. American Loan & Trust Co.,* supra, 136 U.S. pp. 96–103, 10 S.Ct. pp. 952–955. GATX omits mention of the first receivership and the Supreme Court's ruling with regard thereto, and rests its argument on the second receivership and the Supreme Court's ruling with regard thereto. Yet the second receivership bears little resemblance to the Chapter 11 bankruptcy now before this Court. In particular, what is property of the estate in this Chapter 11 case is determined by statute, 11 U.S.C. § 541, and is not determined at the option of Debtor or Trustee—hence there is no basis for treating possession of the cars upon commencement of the case as an implied consent to payment of rent. The first receivership in *Kneeland v. American Loan & Trust Co.,* supra, bears a somewhat closer resemblance to the case now before this Court; and the Supreme Court refused to grant priority to rent payments accrued during the first receivership. All things considered, *Kneeland v. American Loan & Trust Co.,* supra, does not compel this Court to grant any extraordinary priority to GATX's post-petition rent herein.

The list of types of administrative expenses in 11 U.S.C. § 503 is not absolutely exclusive, 11 U.S.C. § 102(3). But the circumstances herein do not warrant creation of an extraordinary non-statutory administrative expense priority for GATX's unpaid post-petition rent.

The Court concludes that GATX has failed to show that it should be given administrative expense priority for post-petition rent of its railcars under rejected leases, at the contract rate or in any amount whatsoever. Under these circumstances, the first issue or question posed by the parties must be answered in the negative; the second is rendered moot, although it may be observed that in any event GATX would not be entitled to any post-petition rent on its rejected leases for any period later than May 15, 1984; and the third is likewise rendered moot.

Accordingly, the Trustees' objection to GATX's administrative expense claim is granted, and GATX's claim for post-petition rent on rejected leases is denied insofar as it seeks administrative expense priority, but allowed as a claim under 11

U.S.C. § 502(g) insofar as not duplicative of GATX's other claim(s).

AND IT IS SO ORDERED.