**In re REPUBLIC FINANCIAL CORPORATION, Debtor.**

**Bankruptcy No. 84–01460–W.**

United States Bankruptcy Court, N.D. Oklahoma.

June 25, 1991.

See also 75 B.R. 840.

---

Frederick Dorwart, Tulsa, Okl., for debtor.

Sam Bratton, II, Tulsa, Okl., for Trustee, R. Dobie Langenkamp.

ORDER GRANTING IN PART AND DENYING IN PART "FIRST INTERIM APPLICATION OF DEBTOR'S COUNSEL FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED" INCLUDING SUPPLEMENT(S) THERETO

MICKEY DAN WILSON, Chief Judge.

The law firm of Holliman, Langholz, Runnels & Dorwart filed its first interim application for compensation for services and reimbursement of expenses. After hearings, the matter was taken under advisement. Before said hearings, objections were filed by the Trustee, Creditors' Committee, and many other parties in interest. At hearing, certain issues were raised by the Court. After hearing, supplemental and renewed requests were filed by Holliman, Langholz, Runnels & Dorwart; and a renewed objection was filed by the Trustee. Upon consideration of evidence introduced and received, and of the record herein, the Court, pursuant to Bankruptcy Rules 7052 and 9014, finds, concludes, and orders as follows.

## FINDINGS OF FACT

Wesley R. McKinney ("McKinney") controlled and operated a number of business entities, including Republic Financial Corporation ("RFC"), Republic Trust & Savings Company ("RTS"), Republic Bancorporation, Inc. ("RBI"), Sunbelt Bancorporation, Inc., Central Bank & Trust Company, Petra International Corporation, Petra Pe-

troleum Corporation, Petra Drilling Corporation, Petra Transportation Corporation, Petra Exploration, Inc., Petra Aviation Corporation, K & M Construction, Inc., and Arden Drilling Company ("the Petra companies"), Allied Oil and Gas Corporation ("Allied"), Illinois Pipeline Corporation, Trinity Operating Corporation, and HMC Resources, as well as others not named herein. Although these entities were ostensibly separate, and in many cases conducted different businesses, they dealt with McKinney and with each other and were interrelated in various complex and obscure ways. The extent of their interpenetration, the complexity of their relationships, the occasional synchronization of their behavior, and the difficulty of tracing and allocating funds and other assets among them, are all well illustrated by a series of transactions undertaken by some of them at McKinney's direction in mid–1984 and now known as "the divestiture," see Trustee's Report of Investigation in RFC and RTS filed August 6, 1985. This "divestiture" was occasioned by a combination of Federal regulatory pressure and downturn in the Oklahoma economy, and signaled the beginning of the end of McKinney's financial empire. When McKinney's empire fell, it fell largely into the arms of this Court.

On September 24, 1984, RFC, RTS and RBI filed their respective voluntary petitions for relief under 11 U.S.C. Chapter 11 in this Court, commencing Case Nos. 84–01460, –01461 and –01462 respectively. On January 9, 1985, the eight Petra companies filed their respective voluntary petitions for relief under 11 U.S.C. Chapter 7 in this Court, commencing Case Nos. 85–00024 through –00031. The next day, an involuntary petition for relief under 11 U.S.C. Chapter 7 was filed against McKinney individually in this Court, commencing Case No. 85–00042; and relief was granted on March 22, 1985.

RFC, RTS, RBI, and all the Petra companies were represented in bankruptcy by the law firm of Holliman, Langholz, Runnels & Dorwart ("HLR & D"). McKinney was not represented in his bankruptcy case by HLR & D; but he was represented by Judith S. Brune, an attorney formerly employed by HLR & D, who had recently resigned from HLR & D and entered solo practice and whose then husband, Kenneth L. Brune, continued to be employed by HLR & D.

With the debtor's petition in RFC, HLR & D filed, pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(a), a "Statement of Attorney's Compensation." Said statement was executed by "Frederic Dorwart on behalf of [HLR & D]." Said statement reads, in pertinent part,

... As compensation for the services rendered in connection with these proceedings, I have been paid the sum of $-0- including the sum of $-0- for costs and attorney's fees. Such sum was received from _____.

... In addition to the above amount, I have been promised the sum of $-0- by _____, who is the source of such sum; the additional amount to be paid as follows: _____.

Similar statements were filed with the petitions in RTS and RBI. The statement in RTS discloses payment of $16,000 received from RTS (in a manner which indicates that the statement was first filled out to read "$6,000" and was then altered to read "$16,000"). The statement in RBI discloses payment or promise of "$-0-." Similar statements were also filed with the petitions in the Petra cases, each disclosing payment of $200 received from each debtor.

Two days after the filing of the debtor's petition in RFC, HLR & D filed, pursuant to 11 U.S.C. § 327(a) and Bankruptcy Rule 2014(a), an "Application for Appointment of Attorneys for Debtors." Said application was executed by Frederic Dorwart, and requested "the [a]ppointment of Frederic Dorwart and Neal Tomlins and other members of the law firm of [HLR & D] as attorneys for the debtor ..." Said application recited "that said Frederic Dorwart and Neal Tomlins and other members of the law firm of [HLR & D] ... do not hold or represent an interest adverse to the estate, are disinterested persons, ... and do not, in connection with the case, represent a creditor," although "Frederic Dorwart and Neal Tomlins and other members

of the law firm of [HLR & D] have represented and do represent, on a limited basis in selected matters certain affiliates of the debtor." Said application was granted *ex parte* by order filed on the same day, i.e. on September 26, 1984. Substantially similar applications were filed in RTS and RBI, and were granted by orders filed on Sept. 26 and Sept. 27, 1984. No such applications were filed in the Petra cases, since attorneys for debtors in Ch. 7 cases are not normally employed by the bankruptcy estate with approval by the Court.

The McKinney-related cases, RFC and RTS in particular, were highly publicized and hotly litigated. RFC and RTS involved thousands of creditors, many of them innocent parties who had never before seen the inside of a courtroom and whose life savings were threatened by the debtor companies' financial difficulties. The other cases involved fewer creditors, but also fewer assets and fewer or more disorganized records. The intensity of involvement in these cases generated more heat than light: administration of the cases has been plagued from the beginning by anxiety, confusion, misunderstanding, acrimony, and vilification. At least some of this ill feeling was inevitable and duly provoked— for example, McKinney was eventually convicted on criminal charges (though for acts only incidentally related to the financial demise of the entities in bankruptcy); and the Trustee's investigation of the history of RFC and RTS uncovered substantial evidence of pre-bankruptcy mismanagement and finagling. These bankruptcy cases have proceeded in an atmosphere of suspicion, resentment, and desperate struggling over the remaining assets of the debtors.

HLR & D played an active part in the early stages of the proceedings in RFC and RTS. HLR & D prepared the petitions and other documents which were required to be filed to commence the cases; thereafter prepared the statements of financial affairs, schedules of debts and assets, and voluminous mailing lists which provided the information basic to administration of the cases (and, a rare event even in less difficult cases, got the statements and schedules filed within the period allowed by

Bankruptcy Rule 1007(c)); performed initial general mailings instead of the Bankruptcy Clerk's Office, including the essential notice of meeting of creditors and of related events; fielded initial inquiries by parties in interest, a heavy burden where the number of creditors ran into the thousands and which sometimes required the full efforts of the firm (in addition to the time of debtors' own employees); "handled the press;" and contributed to the stage-management of the largest meeting of creditors ever held in a bankruptcy case in this District. Only one day after RFC entered bankruptcy, a creditor named Mize filed a group of motions calling for removal of debtor's own management and appointment of a Trustee, immediate determination of a long-standing dispute between RFC and Mize, and abandonment of an important asset of the estate. These motions were objected to by HLR & D on October 1, 1984. However, on October 10 and 11, 1984, the Creditors' Committees in RFC and RTS filed their own motions for appointment of a Trustee, which said motions were heard on October 30, 1984, and granted by orders filed October 31, 1984. HLR & D for debtors acquiesced in the Committees' motions and consented to the appointment of a Trustee. HLR & D assisted the Trustee and his attorneys in the transfer of responsibility for administration of RFC and RTS, but thereafter played no significant part in the development of these cases.

HLR & D's role was quite different in the Petra cases. A member of HLR & D actually signed the bankruptcy petitions in lieu of officers of the debtors. But all statements, schedules, etc., which even in Ch. 7 cases are normally prepared by debtor and debtor's attorney, were in these cases left to be prepared by the Ch. 7 Trustee; and all subsequent administration was likewise performed by the Ch. 7 Trustee. HLR & D was not directly involved in the McKinney case at all, except as will be noted below.

On March 22, 1985, HLR & D filed in RFC a "First Interim Application of Debtor's Counsel for Compensation for Services

Rendered and Reimbursement of Expenses Incurred," requesting attorney fees of $52,258.60 and reimbursement of expenses of $8,499.15. Said application recited that

> No monies have been received as compensation for services rendered or reimbursement for expenses incurred in connection with this bankruptcy case since the commencement of this case. The Statement of Attorney's Compensation filed by Counsel in this case on September 24, 1984 noted that no monies had been received from the Debtor for services to be rendered in this case.

Appended to said application was an "Affidavit" by Frederic Dorwart, which declared under penalty of perjury that "To the best of my knowledge, information and belief, the contents of the foregoing application are true, correct and complete ..." A similar application was filed on the same day in RTS, requesting attorney fees of $38,571.10 and reimbursement of expenses of $7,403.51. Appended thereto was a similar affidavit.

The above-described applications, together with other fee applications filed at approximately the same time by the Trustee, his attorneys, and other professionals serving in RFC and RTS, were set for hearing before this Court on May 7, 1985. Before the hearing, some 297 objections to all of the fee applications were filed in RFC, and a somewhat smaller number in RTS, by former depositors in the debtor institutions. These objections for the most part followed three or four standard forms whose gist was that no professionals should be paid anything in the case until all depositors had recovered all of their deposits. In addition, in RFC the Trustee and Creditors' Committee, and in RTS the Trustee, filed their objections to HLR & D's applications. These objections dealt with matters of detail, alleging such things as duplication of time, insufficient description of activities, recordation of time in overlarge increments leading to "padding," questionable expenses, etc. At the hearing on May 7, 1985, evidence both documentary and testimonial, including the testimony of Frederic Dorwart on behalf of HLR & D, was re-

ceived. The hearing was not concluded on May 7, but was continued to May 22, 1985.

On May 10, 1985, Fred W. Woodson, Trustee in the Ch. 7 case of McKinney individually, filed a complaint commencing Adv. No. 85–0138, Woodson v. HLR & D, Frederic Dorwart individually, and others not relevant hereto. The complaint alleged that HLR & D had received valuable paintings from McKinney within one year before bankruptcy, either with actual intent to hinder, delay or defraud creditors, or in a manner which created or aggravated McKinney's insolvency; and that Dorwart individually "has delayed, hindered, prolonged and complicated the administration and investigation of the Estate," complaint p. 10.

On May 22, 1985, the hearing on fee applications in RFC and RTS was reconvened and concluded. All of the fee applications, including those of HLR & D, were taken under advisement.

At some time during the hearings on the fee applications (probably on May 22, after the filing of the complaint in 85–0138 on May 10, 1985), the Court inquired into the existence of transfers of property to HLR & D by McKinney or his business entities before and after bankruptcy. In response to these inquiries, on June 13, 1985, HLR & D by Neal Tomlins filed in RFC and RTS a "Supplement to First Interim Application of Debtor's Counsel for Compensation for Services Rendered and Reimbursement of Expenses Incurred," disclosing "payments for legal services and costs received by HLR & D during the period June 24, 1984 to date from any of Sunbelt Bancorporation, Inc., [RBI], [RFC], [RTS], ... Central Bank & Trust Company (formerly Sunbelt Bank & Trust Company) ... Wesley R. McKinney and other entities in which Wesley R. McKinney is believed by HLR & D to have had an interest (directly or indirectly)." The list, with its footnotes, is appended hereto as Exhibit A. It discloses receipt by HLR & D from various McKinney entities of property worth more than $300,000. This includes $31,400 received from RTS on the day RTS and RFC filed bankruptcy; property valued at approximately $175,000

received from the Petra companies two days before RFC and RTS filed bankruptcy; and paintings and other valuable property received from McKinney individually on the same day. It states that "HLR & D has delivered possession of [McKinney's] property to the trustee ... in ... Case No. 85–00042 ... Adversary No. 85–0138," but does not make clear that the turnover came only after the Trustee in McKinney sued HLR & D and one of its attorneys in the named adversary proceeding, not only for turnover but for obstructing administration. It also includes $65,098.63 received from Allied during the month preceding the bankruptcy of RFC and RTS, and another $23,824.16 received from Allied in the five months following the bankruptcy of RFC and RTS.

On November 19, 1986, Frederic Dorwart for HLR & D filed another "Supplement to First Interim Application of Debtor's Counsel for Compensation," which described itself as "merely a recapitulation in a different format of the same information set forth in the [original] Application," p. 3. This document should have been entitled "Second Supplement ..."

On January 8, 1987, Kenneth L. Stainer, Trustee in the Ch. 7 cases of the Petra companies, filed two complaints commencing Adv. Nos. 87–0011, 87–0012, both styled Stainer v. [HLR & D]. Both complaints sought to recover the property transferred by two of the Petra companies to HLR & D two days before RFC and RTS filed bankruptcy, on the theory that the transfers were either preferential under 11 U.S.C. § 547 or fraudulent under 11 U.S.C. § 548. The complaints, of course, dealt with preference or fraud with respect to the Petra companies, not with respect to RFC and RTS. The complaints alleged that HLR & D

... had performed legal services for [two Petra companies] and for other persons and entities variously connected with [said two companies], including but not limited to Wes McKinney, Allied Oil and Gas, Republic Bank, and the "Petra group" companies other than [the two already specified].

. . . . .

By reason of the intimate knowledge of [the two Petra companies'] condition acquired by representing [said two companies] and the other entities, [HLR & D] were insiders of [the two Petra companies] upon the date of transfer.

... The stated transfers, to the extent they paid or satisfied antecedent debts of [the two companies], enabled [HLR & D] to obtain a greater proportion of their outstanding accounts than other unsecured creditors shall receive. Further, such transfers were not in the normal course of ... business [of either the two companies or of HLR & D].

... The stated transfers, to the extent they paid or satisfied outstanding accounts of entities other than [the two Petra companies], were made without adequate consideration at a time [the two Petra companies] were insolvent. Further such transfers were made with ... the actual intent to hinder and delay all other creditors of Debtors.

Defendant HLR & D moved for judgment on the pleadings and for summary judgment, which said matters remain under advisement.

On June 14, 1990, HLR & D filed its "Request ... For Order Approving the First Interim Application of Debtor's Counsel for Compensation for Services Rendered and Reimbursement of Expenses Incurred." This document summarized the prior proceedings, making no mention of the First "Supplement ..." filed on June 13, 1985, but referring to the "Supplemental Application ... filed November 14 [sic; Nov. 19], 1986;" asserted the "high quality" and "great value" of HLR & D's services; alleged that "No valid objection to the entitlement of [HLR & D] to an award of fees and reimbursement of expenses was made;" asserted that "the record has been fully established and discloses, to the knowledge of [HLR & D], no basis for denial of its fees and expenses" and that HLR & D "is entitled to the immediate entry of an order reimbursing its costs and

paying its fees." HLR & D also asserted its "entitlement" to interest.

On June 22, 1990, the Successor Trustee in RFC and RTS filed his "... Objection to Request of [HLR & D] for Order Approving the First Interim Application ..." The objection pointed out the transfers disclosed by the first "Supplement ..." filed on June 13, 1985; and asserted as follows:

The Successor Trustee submits that all or a portion of the $206,400.00 of cash and property received by [HLR & D] immediately prior to or contemporaneously with the commencement of the case (which receipt was not disclosed ... until the Court's independent inquiry at the hearing on the [HLR & D] fee application) should be credited against any sums awarded to [HLR & D]. Also to the extent that any portion of the $31,400.00 received from [RTS] on the date of the commencement of the case is claimed to be a payment of antecedent debt owed by [RTS], such transfer is avoidable under 11 U.S.C. § 547 and should be offset against any sums awarded to [HLR & D].

... In addition to being an affiliate of [RFC and RTS], Allied was a substantial borrower from [RTS] and/or [RFC], owing in excess of $1,000,000.00. The Allied debt to Republic was past due, owing and in default at the time of the payments from Allied to [HLR & D]. The Allied debt to Republic and the Trustee's and Successor Trustee's substantial and expensive efforts to collect it are detailed in the Trustee's reports to the Court, in counsel for the Trustees' fee applications and in the Touche, Ross report on loans to related parties. The Allied loan and others like it, were a major reason for the collapse of [RFC and RTS]. See the Trustee's Report of Investigation filed August 5, 1985. It would be inequitable to allow [HLR & D] to draw over $88,000.00 from an affiliate of [RFC and RTS] at a time when the affiliate owed a major debt to [RFC and RTS] when at the same time, [RFC and RTS were] essentially out of cash .... The request for allowance of interest should be denied because [HLR & D] was effectively paid in full, in advance, by virtue of the payments described above. In addition, the Court, in the exercise of its discretion, should not allow interest on any fees or reimbursement of expenses because of the lack of full and timely disclosure of compensation received from [RFC's and RTS'] affiliates,

Successor Trustee's obj. pp. 2–4.

On July 3, 1990, Frederic Dorwart for HLR & D filed a "Reply ... to Successor Trustee's Objection to HLR & D Fee Application." This document described the Successor Trustee's objection as "unconscionable ... born of an inexcusable ignorance of the facts ... neither grounded in fact nor warranted in law ... absurd and untimely," reply pp. 1, 5. HLR & D described as "the worst" of the Successor Trustee's various objections "the argument that HLR & D should have worked for nothing (despite the fact HLR & D was employed pursuant to order of this Court) because HLR & D was paid for other work done for other entities in which Wesley R. McKinney had an interest which owed [RFC or RTS] money." HLR & D commented, "Too bad this issue was not raised five years ago when the evidentiary hearing was held," and alleged that

HLR & D met with the Court prior to commencement of the proceedings and discussed these circumstances with the Court. Full disclosure was made to the Court of the other work of HLR & D. *Thereafter*, the Court approved the employment of HLR & D. Had the Successor Trustee's attorney made any reasonable investigation of the facts prior to filing his objection, he would have ascertained that his objection in this ... regard had no basis,

reply p. 3 n. 1. HLR & D further alleged that

... The work was done to protect the assets of the other entities. To the extent the other entities owed [RFC or RTS] money, [RFC and RTS] were benefited by the work.

... HLR & D provided valuable services to the other entities well beyond the date of the payments made to HLR & D.

... HLR & D suffered a very substantial loss above and beyond any payments it received.

... All payments received by HLR & D were entirely lawful and ethical (the unfounded innuendos of the Successor Trustee's attorney to the contrary notwithstanding).

... The Court may assume that, if the Successor Trustee's attorney really believed any such payments were preferences or were unlawful or unethical, he would have filed appropriate proceedings on a timely basis. The Successor Trustee's attorney is limited to, and bound by, the Trustee's Objection filed May 3, 1985, in which the Trustee set forth certain limited objections which were fully satisfied at the May 22, 1985 hearing by appropriate evidence in support of the HLR & D application,

reply pp. 3–4, and n. 2. HLR & D again asserted its "entitlement to its fees and expenses," which "entitlement" was said to be "statutory, not equitable," reply p. 5. HLR & D claimed that "If, at this juncture, this Court were (albeit improperly) to consider the so-called 'equities', HLR & D should be paid substantially more than it has requested," reply p. 5.

Any "Conclusions of Law" which ought more properly to be "Findings of Fact" are adopted and incorporated herein by reference.

## CONCLUSIONS OF LAW

This is a core proceeding under to 28 U.S.C. § 157(b)(2)(A), (B), (C), (O), 11 U.S.C. §§ 327–331, 503(b), 507(a).

■ HLR & D asserts its "entitlement" to payment of fees and reimbursement of expenses for its representation of a Ch. 11 debtor. HLR & D states that payment is "required" and that consideration of "the so-called equities" is "improper." All of these assertions are without merit. One of the most elementary principles of bankruptcy administration is that allowance of claims, especially on a priority basis, for fees and expenses of professional persons employed by a debtor estate after bankruptcy is subject to the Bankruptcy Court's

equitable discretion—although such discretion is not absolutely unbridled. This principle was declared by the United States Supreme Court half a century ago, *Woods v. City Nat'l Bank & Trust Co. of Chicago et al.*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941), *Dickinson Industrial Site Co. v. Cowan*, 309 U.S. 382, 60 S.Ct. 595, 84 L.Ed. 819 (1940); is clearly codified by statute in the present Bankruptcy Code, 11 U.S.C. § 328(a) "... court *may* allow ...," (c) "... court *may* deny ...," § 329(b) "... court *may* cancel ...," § 330(a) "... court *may* award ..." (emphases added); and has been recognized by every Court of Appeals that has passed on the subject, see e.g. *In re Martin*, 817 F.2d 175, 180 (1st Circ.1987), *In re Boston and Maine Corporation*, 778 F.2d 890, 894 (1st Circ.1985), *In re Futuronics Corporation*, 655 F.2d 463, 471 (2d Circ.1981), *In re Arlan's Department Stores, Inc.*, 615 F.2d 925, 943–944 (2d Circ.1979), *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051, 1059 (5th Circ.1986), *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1255–1256 (5th Circ., 1986), *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1091 (5th Circ.1980), *In re Georgetown of Kettering, Ltd.*, 750 F.2d 536, 540–541 (6th Circ.1984), *In re Pierce*, 809 F.2d 1356, 1363 (8th Circ.1987), *In re Daig Corporation*, 799 F.2d 1251, 1253 (8th Circ.1986), *In re McCombs*, 751 F.2d 286, 287–288 (8th Circ.1984), *In re Nucorp Energy, Inc.*, 764 F.2d 655, 657 (9th Circ.1985), *Southwestern Media, Inc. v. Rau*, 708 F.2d 419, 422 (9th Circ.1983), *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 598 (10th Circ. 1990), *In re Mullendore*, 527 F.2d 1031, 1038 (10th Circ.1975), *Red Carpet Corp. of Panama City Beach v. Miller*, 708 F.2d 1576 (11th Circ.1983), *In re AOV Industries, Inc.*, 797 F.2d 1004, 1008 (D.C.Circ. 1986), and cases cited therein—as well as by lower courts in numbers beyond any need to reckon. The question before this Court is whether, or to what extent, HLR & D *deserves* to be paid for its services performed and expenses incurred in this case.

■ As a general rule, professional persons hired with Court approval to work

for a bankruptcy estate should be compensated for their services and reimbursed their expenses as would similar professionals doing comparable work outside bankruptcy. This rule serves the policy of encouraging competent administration of bankruptcy cases. Under ordinary circumstances, it also accomplishes simple fairness. Although there is no "entitlement" to compensation and reimbursement of expenses, the commitment of time and money on behalf of a bankruptcy estate constitutes a powerful equity—as this Court has itself observed, "A court of equity is seldom justified in disregarding *quantum meruit,*" *In re First Security Mortgage Company, Inc.,* 117 B.R. 1001, 1007 (B.C., N.D. Okl.1990). However, there may be countervailing factors. For example, the equity in favor of paying just rates for work done does not justify paying inflated rates, or paying for work not done. Nor should the policy of encouraging proper and skillful administration serve to excuse improper and wasteful administration, such as doing unnecessary work or incurring unnecessary expenses. Even compensation and reimbursement which would otherwise be proper, may be reduced or entirely withheld under extraordinary circumstances involving egregious misconduct by the party requesting such compensation and reimbursement.

Here, there is no doubt that HLR & D performed services and expended costs which aided in the administration and benefited the estates of RFC and RTS. The proposition, raised in numerous objections to all fee applications filed in RFC and RTS, that no professionals working for these estates should be paid anything until all creditors had been paid in full, is entirely without merit, both in law and as a matter of sound policy. The proposition, raised in certain other objections to the applications of HLR & D, that the precise amounts requested by HLR & D should not be paid—because some work was not done, or some work done and costs expended were not reasonably necessary, or insufficient proof was provided as to such matters—is proper in principle. In this instance, such matters of detail pertaining to the "internal" merits of HLR & D's application need not be reached, until one further difficulty is disposed of. Here, HLR & D's so-called "entitlement" to compensation and reimbursement is impeached by circumstances indicating wilful nondisclosure of facts bearing on a conflict of interest, as well as certain other conduct unbecoming a fiduciary and an officer of this Court.

11 U.S.C. § 329(a) requires "any attorney representing a debtor in a case under this title, or in connection with such a case," to "file with the court a statement of the compensation paid or agreed to be paid" within one year before the filing of the bankruptcy petition "for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." Bankruptcy Rule 2016(b) presently provides that "A supplemental statement shall be filed within 15 days after any payment or agreement not previously disclosed;" but this provision was added to the Rule by amendment only in 1987. 11 U.S.C. § 327(a) provides for the employment "with the court's approval" of "professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons ..." Bankruptcy Rule 2014(a) requires that any application for employment "stat[e] the specific facts showing ... any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants." This Rule presently provides that "The application shall be accompanied by a verified statement ...;" but this provision was added to the Rule by amendment only in 1987. 11 U.S.C. § 330(a) provides that "the court may award to a trustee ... or to the debtor's attorney—(1) reasonable compensation for actual, necessary services rendered ...; and (2) reimbursement for actual, necessary expenses." Bankruptcy Rule 2016(a) provides that "An application for compensation shall include a statement as to what payments have theretofore been made or

promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case [and] the source of the compensation so paid or promised ..." 11 U.S.C. § 328(c) provides that "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person ... if, at any time during such professional person's employment ... such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."

■ A debtor-in-possession in bankruptcy is the equivalent of a Trustee, 11 U.S.C. § 1107(a), and is therefore a fiduciary and is expected to act like one. The same is true of the debtor-in-possession's attorney. The Court of Appeals of the Tenth Circuit has had occasion to elaborate upon general trust principles and the duty owed to a trust by a trustee. In *Wootten v. Wootten*, 151 F.2d 147 (10th Cir.1945) this court stated at pages 149–150 (footnote omitted):

> The standards of conduct for a trustee rise far above the ordinary morals of the market place. Not honesty alone, but a punctilio of honor the most sensitive is the standard of behavior required of a trustee. He must completely efface self-interest. His loyalty and devotion to his trust must be unstinted. Its well-being must always be his first consideration. These principles are inveterate and unbending.

Professor Scott in his treatise has elaborated upon these principles as follows:

> The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty. This duty is imposed upon the trustee not because of any provision in the terms of the trust but because of the relationship which arises from the creation of the trust. A trustee is in a fiduciary relation to the beneficiaries of the trust. * * * It is the duty of a trustee to administer the trust solely in the interest of the beneficiaries. He is not

permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries.

> 2 Scott on Trusts § 170 pp. 1297–1298 (1967) (footnotes omitted). In light of these statements, actions of [trustees] must be measured by very strict standards,

*Grynberg v. Watt*, 717 F.2d 1316, 1318–1319 (10th Cir.1983). A Ch. 11 bankruptcy case is admittedly a trust of an unusual type, whose obligations may be unusually difficult and even contradictory. But the administrator of such a case, whether Trustee or debtor-in-possession or attorney of either, remains a fiduciary who must be held to the high standards of conduct demanded of all fiduciaries, with due allowance for the peculiarities of Ch. 11 bankruptcy cases.

As a matter of professional ethics, any attorney must make full disclosure of his own interests and the interests of other clients which may affect his professional judgment, and must decline new employment and cease multiple employment unless "it is obvious that he can adequately represent the interest of each [client] and if each [client] consents ... after full disclosure," DR 5–101(a), DR 5–105; shall not, "except with the consent of his client after full disclosure ... accept compensation for his legal services" or "any thing of value related to his representation of or his employment by his client" from "one other than his client," DR 5–107(A); shall not "prejudice or damage his client during the course of the professional relationship," DR 7–101(A)(3); shall not "conceal or knowingly fail to disclose that which he is required by law to reveal ... knowingly make a false statement of law or fact ... [or] knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule," DR 7–102(A)(3), (5), (8); and "shall not ... engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, [or] engage in conduct that is prejudicial to the administration of justice," DR 1–102(A)(4), (5); see 5 O.S. Chap. 1—App. 3, *Code of Professional Responsibility* (effective before July 1, 1988).

■ To the extent that the Republic entities were debtors and creditors of each other, HLR & D could not engage in multiple representation of such entities in a situation (like bankruptcy) where collection of debts and realization of accounts was in issue. To the extent that HLR & D was itself a creditor of RFC and RTS for pre-petition legal services, or to the extent that HLR & D was no longer a creditor only because HLR & D was itself the recipient of transfers from RFC or RTS that were or might be preferential or fraudulent under 11 U.S.C. §§ 547, 548, HLR & D could not be a disinterested person. To the extent that HLR & D took the remaining assets of Allied for its own benefit and to the detriment of RFC and RTS, HLR & D actually held an interest adverse to its own clients (RFC and RTS). In Ch. 11, "the client" is not only the current management of the debtor-in-possession but is, in some degree, the creditors and the Court itself; HLR & D was bound to make full disclosure to creditors and Court of all of the above circumstances. Despite three different opportunities in RFC and RTS alone—the statement of attorney's compensation, the application for employment, and the application for compensation and reimbursement—HLR & D did not make the appropriate disclosures. Some of the representations made may have been true as far as they went; but they did not go nearly far enough. Others (e.g. the conclusory representations that HLR & D was disinterested and held no adverse interest) were simply not true. If full and timely disclosure had been made, the Court would not, and obviously could not, have approved HLR & D's employment as attorneys for RFC and RTS in the first place.

This case provides a good example of the reasons for the 1987 amendments to Bankruptcy Rules 2014(a), 2016(b). Although these amendments had not been made in late 1984–early 1985 when events herein transpired, this does not excuse HLR & D's derelictions herein. Even under then-current law, HLR & D did not meet its obligations under the Bankruptcy Code, the Bankruptcy Rules, the fiduciary standards, or the attorney's Code of Professional Responsibility.

■ HLR & D proposes that "this issue" should have been "raised five years ago when the evidentiary hearing was held," and that "The Successor Trustee's attorney is limited to, and bound by, the Trustee's Objection filed May 3, 1985," which only raised less drastic grounds of objection. It appears from the record that "this issue" could not have been raised when the Trustee filed his first objection on May 3, 1985, or at the time of the first evidentiary hearing on May 7, 1985, because the Trustee in RFC and RTS had no reason to suspect the existence of the problem until May 10, 1985 at the earliest, when another Trustee in McKinney's individual case filed his complaint against HLR & D seeking to recover transfers and accusing Frederic Dorwart of obstructing administration of that case. As a practical matter, since the Trustee in RFC and RTS was not party to the complaint in McKinney's case, he and his attorneys had no reason to know of this possible ground of objection until the Court raised the matter at the hearing on May 22, 1985. Thereafter, the problem was certainly well known to all concerned. HLR & D did not file its "Supplement ..." of June 13, 1985, disclosing these transfers, in a vacuum. The Trustee filed no document at the time stating the problem in writing; but since the matter had been raised by the Court and was well known to the Court and to all parties, there was no need to file any such document—not, at least, until HLR & D filed its "Request ..." of June 14, 1990, which read as if the problem did not exist. In any event, notwithstanding HLR & D's assertions to the contrary, the problem *is* apparent from the record, and has been so since, at the latest, the filing of the disclosures in HLR & D's "Supplement ..." of June 13, 1985. Whether any party timely objected or not, this Court has the independent power and duty to satisfy itself of the propriety of any awards of compensation or reimbursement of expenses. This Court will exercise the power and do its duty.

■ HLR & D alleges that "HLR & D met with the Court prior to commencement

of the proceedings and discussed these circumstances with the Court. Full disclosure was made to the Court of the other work of HLR & D," reply p. 3 n. 1. HLR & D may have informed the Court, shortly before or after RFC and RTS filed bankruptcy, that HLR & D also represented affiliates of RFC and RTS "on a limited basis in selected matters" as recited in HLR & D's "Application for Appointment of Attorneys for Debtors." HLR & D certainly did *not* tell the Court that HLR & D would receive over $30,000 from RTS on the day of bankruptcy although the Statement of Attorney's Compensation filed that day in RTS disclosed payment of only $16,000; that HLR & D had recently plundered over $200,000 from RFC, RTS and their affiliates in payment for antecedent or anticipated debts for legal services; that at least one of these affiliates, Allied, owed RFC and/or RTS more than a million dollars; that HLR & D had already diverted some of Allied's remaining assets to pay HLR & D instead of RFC or RTS; and that HLR & D intended to go on satisfying its own debt from Allied while RFC's and RTS's debt from Allied went unpaid, while simultaneously representing RFC and RTS as debtors-in-possession owing a fiduciary obligation to the creditors of RFC and RTS. But even if HLR & D had disclosed all these things to the Court, it would make no difference. Public concealment is not cured by private disclosure. The Creditors' Committees, the Trustee, their attorneys, the creditors and parties in interest, and the public at large, were none of them privy to any such private disclosures. All of them were entitled to know whether HLR & D and the Court itself were acting properly in these cases. The fact is that HLR & D's statement of compensation, application for employment, and application for interim compensation and reimbursement, were all of them incomplete and misleading, omitting material information which must have been known to HLR & D, and serving to conceal an actual conflict of interest as well as possible potential conflicts of interest. HLR & D's contention that it whispered the truth while shouting a falsehood is of no avail.

HLR & D argues that the work it says it did for affiliates of RFC and RTS benefited the estates of RFC and RTS. It is difficult to see how such a substantial drain of cash and property, from entities which owed RFC and RTS debts which were left unpaid and unpayable, "benefited" RFC and RTS. To the extent that any benefit could be shown, and absent any conflict of interest, HLR & D might have been paid in part for its efforts by the estates of RFC and RTS. The proper course would have been full disclosure, allowing the fact and nature of services and the extent of any benefit to be determined. In any event,

> A fiduciary ... in a reorganization may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one. Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries "at a level higher than that trodden by the crowd."

*Woods v. City Nat'l Bank & Trust Co. of Chicago*, 312 U.S. p. 269, 61 S.Ct. p. 497, 85 L.Ed. p. 826.

HLR & D argues that "if the Successor Trustee's attorney really believed any such payments were preferences or were unlawful or unethical, he would have filed appropriate proceedings on a timely basis." The Trustee's failure to bring a preference action does not excuse HLR & D's failure to disclose the likelihood that such an action should be brought. Moreover, reduction or denial of HLR & D's compensation and reimbursement for expenses might well serve the Trustee as a relatively simple and inexpensive means of recouping some of the value of any preferential transfers.

There are certain aggravating factors.

One of them is the generally noxious atmosphere of these bankruptcy cases. This Court will not sacrifice HLR & D or any other professional person merely to appease disgruntled creditors. But much of the ill-feeling that permeates these cases is understandable and should have been anticipated. Complaints about the high cost of bankruptcy administration are un-

derstandable where such administration must be paid for out of creditors' life savings. Suspicions of mismanagement and looting are understandable where businesses perceived as "banks" suffer financial collapse under obscure circumstances involving complex insider dealings. HLR & D had reason to know these things in advance. In such conditions, the only hope of assuaging some of the bitterness and allaying some of the suspicion lay in candor and upright conduct. Instead of displaying "honesty ... a punctilio of honor the most sensitive ... loyalty and devotion to [its] trust," HLR & D gave an exhibition of misrepresentation, concealment, selfishness and conflict of interest. HLR & D has helped confirm the suspicions of those who thought they were being cheated.

Another is HLR & D's conduct in matters affecting related cases. What HLR & D calls a "benefit" to RFC and RTS, appeared to the Trustees of the McKinney and Petra cases as preferential or fraudulent transfers. This shows the untenable situation in which HLR & D placed itself by attempting multiple representation of these various entities. The Court notes with dismay the allegations in two complaints filed by two different Trustees that HLR & D acted with actual intent to hinder, delay or defraud creditors; and the accusation made by the Trustee in the McKinney case that a member of HLR & D "delayed, hindered, prolonged and complicated the administration and investigation of the [McKinney] Estate."

Of course, suspicions and accusations are not proof. The suspicions of some of the RFC and RTS creditors go beyond reasonable bounds. As for the various Trustees, the suspicion of the RFC and RTS Trustee that HLR & D either received preferential or fraudulent transfers or else received undisclosed payment in advance for services in these bankruptcy cases, has not been proven; the complaint in the McKinney case was never tried, due to HLR & D's turnover of the property in question; and the complaint in the Petra cases is pending. But it is not just an unhappy coincidence that three different Trustees in three different groups of cases all came to act on the belief that HLR & D was involved in preferential or fraudulent transfers, conflicts of interest, suppression of truth and obstruction of administration. Whether or not HLR & D was actually guilty of such things, HLR & D did act in a manner that naturally excited suspicion and distrust. For a fiduciary and an officer of the Court, this is an unseemly spectacle. And

> Perceptions are important; how the matter likely appears to creditors and to other parties in legitimate interest should be taken into account. There are other salient factors as well: whether the existence of [the fee arrangement in question] threatens to hinder or to delay the effectuation of a plan, whether it is (or could be perceived as) an impediment to reorganization, and whether the fundamental fairness of the proceedings might be unduly jeopardized (either by the actuality of the arrangement or by the reasonable public perception of it) ... [T]he *potential* for conflict and the *appearance* of conflict, without more, can justify [avoidance of fee arrangements] ...,

*In re Martin*, 817 F.2d pp. 182–183.

There is also a mitigating factor—namely, the fact that HLR & D eventually did disclose the extent of its connections with affiliated entities and payments received before and after bankruptcy. Unfortunately, such disclosure was not made until prompted by the Court itself; and in documents recently filed, HLR & D has been trying to paper over these disclosures. Despite its brief lapse into honesty, HLR & D has not been "playing it straight" even to this day. HLR & D's "Request ... For Order" filed June 14, 1990, and its "Reply ... to Successor Trustee's Objection ..." filed July 3, 1990, contain more examples of misleading half-truths calculated to suggest that all is well when it certainly is not.

A misleading half-truth is merely an unusually insidious form of lie. There will be no lies before this Court—especially not by officers of the Court in a fiduciary position. Before there can be justice, there must be truth. In its pursuit of justice, this Court must insist upon the truth—the whole truth.

■ In *Woods v. City Nat'l Bank & Trust Co. of Chicago,* supra, the U.S. Supreme Court, confronted with a combination of partial nondisclosure and conflict of interest on the part of fiduciaries in a bankruptcy case, approved the complete denial of the erring parties' claims for compensation. The Court further observed,

> Some discrimination, however, is necessary in applying the foregoing rule to claims for expenses. Reimbursement for "proper costs and expenses incurred in connection with the administration" of the estate may be allowed. The rule disallowing compensation because of conflicting interests may be equally effective to bar recovery of the expenditures made by a claimant subject to conflicting interests ... On the other hand, those expenditures normally should be allowed which have clearly benefited the estate. Thus where taxes have been paid, needful repairs or additions to the property have been made, or the like, equity does not permit the estate to retain those benefits without paying for them. Such classification of expenses, at times difficult, rests in the sound discretion of the bankruptcy court,

*Woods v. City Nat'l Bank & Trust Co. of Chicago,* 312 U.S. pp. 269–270, 61 S.Ct. p. 497–98, 85 L.Ed. p. 826. This appears to be a good example to follow. This Court will deny HLR & D's request for compensation *in toto*. But this Court will allow HLR & D's request for reimbursement of expenses, to the extent such expenses benefited the estate.

As noted above, there is no doubt that some of HLR & D's expenditures benefited the RFC and RTS estates. But the propriety of reimbursing some other expenditures has been questioned by the Trustee and Creditors' Committee.

There is one additional factor to be considered. HLR & D has requested interest on its unpaid expenses. It is not HLR & D's fault that the matter has remained undecided for so long (except to the extent that HLR & D created this issue by its actions in the first place). It is not the Trustee's fault either, or the fault of the RFC and RTS creditors. Denial of interest would punish HLR & D for the delay; but allowance of interest would punish the Republic creditors for the delay.

Under the circumstances, the Court determines that the most expedient and equitable course is to allow reimbursement of HLR & D's expenses in the full amount requested, without inquiry into possible reductions in the amount of requested expenses as suggested by the Trustee and the Creditors' Committee. For a comparable expedient in lieu of interest, see *Ramos v. Lamm,* 713 F.2d 546, 555 (10th Circ. 1983) (calculation of long-deferred attorney fee using current instead of historical hourly rates, expressly stated to be in lieu of interest for delay).

Accordingly, HLR & D's request for reimbursement of expenses in the case of Republic Financial Corporation is granted in the sum of $8,499.15; but HLR & D's requests for compensation for services and for interest are otherwise denied. A similar order will be entered in the case of Republic Trust & Savings Company.

AND IT IS SO ORDERED.

EXHIBIT A

REPUBLIC ENTITIES

| DATE | PAYOR | AMOUNT OF PAYMENT |
|---|---|---|
| 7–25–84 | Republic Financial Corporation | $ 444.55 |
| 8–17–84 | Republic Financial Corporation | 4,160.03 |
| 9–24–84 | Republic Trust and Savings Company | 28,000.00 |
| 9–24–84 | Republic Trust and Savings Company (Debtor-in-Possession) | 3,400.00 |

OTHER ENTITIES

| DATE | PAYOR | AMOUNT OF PAYMENT |
|---|---|---|
| 6–27–84 | HMC Resources | 527.50 |

| DATE | PAYOR | AMOUNT OF PAYMENT |
|---|---|---|
| 6–27–84 | Wesley R. McKinney | $ 150.00 |
| 7–06–84 | Arden Drilling Co. | 63.75 |
| 8–24–84 | Allied Oil and Gas Corp. (Michigan National Bank v. Allied, et al.) | 30,098.63 |
| 8–24–84 | Arden Drilling Co. | 10.06 |
| 8–24–84 | Illinois Pipeline Corp. | 154.76 |
| 8–24–84 | Trinity Operating Corp. | 66.00 |
| 9–05–84 | Allied Oil and Gas Corp. (Michigan National Bank v. Allied, et al.) | 30,000.00 |
| 9–10–84 | Wesley R. McKinney | 418.93 |
| 9–22–84 | Petra | Property [1] |
| 9–22–84 | Wesley R. McKinney | Property [2] |
| 9–24–84 | HMC Resources | 2,565.54 |
| 10–12–84 | HMC Resources | 1,476.51 |
| 11–21–84 | Allied Oil and Gas Corp. (Michigan National Bank v. Allied, et al.) | 12,500.00 |
| 12–14–84 | Allied Oil and Gas Corp. (previously deposited with HLR & D on 9–7–84) | 5,000.00 |
| 12–19–84 | Allied Oil and Gas Corp. (Michigan National Bank v. Allied, et al.) | 49.27 |
| 12–19–84 | Allied Oil and Gas Corp. | 1,274.89 |
| 1–09–85 | Petra | 1,600.00 |
| 2–13–85 | Allied Oil and Gas Corp. (Michigan National Bank v. Allied, et al.) | 10,000.00 |

1. On September 22, 1984, Petra assigned and delivered to HLR & D in payment of legal services and costs two Caterpillar D–7 tractors and a working interest in certain oil and gas wells. The two tractors have been sold generating net proceeds of $75,000. The assignment of the oil and gas leases was filed of record on September 25, 1984 in book 654 at pages 163–166 of Roger Mills County, Oklahoma. While the value of the leases cannot be determined with a high degree of accuracy, and the leases are subject to certain liens, HLR & D believes the leases have a value of approximately $100,000.

2. On September 22, 1984, certain property believed to be the property of Wesley R. McKin-ney and certain property believed possibly to be the property of others was assigned and delivered to HLR & D in payment of legal services and costs if owned by McKinney or Petra International and in safe-keeping if owned by others. On or about October 7, 1984, Central Bank & Trust Company of Tulsa offered evidence to HLR & D which indicated to HLR & D's satisfaction that two paintings ("Manuleta with Kachina" by Nicolai Fechin and "Self Portrait" by Leon Gaspard) were the property of Central Bank and HLR & D delivered the two paintings to Central Bank (and Central Bank agreed to indemnify HLR & D if the two paintings were not the property of Central Bank). HLR & D has delivered possession of the balance of said

property to the trustee for sale in In Re: Wesley R. McKinney, Debtor Case No. 85–00042 (Chapter 7) Adversary No. 85–0138 U.S. Bankruptcy Court for the Northern District of Oklahoma.