**In re FIRST SECURITY MORTGAGE COMPANY, INC., Debtor.**

**Bankruptcy No. 89–03147–W.**

United States Bankruptcy Court,
N.D. Oklahoma.

Aug. 21, 1990.

David M. (Mike) Thornton, Jr., Randolph P. Stainer, Tulsa, Okl., for Dunhill.

Patrick J. Malloy, III, Tulsa, Okl., for Trustee.

ORDER GRANTING "MOTION FOR AL-LOWANCE AND PAYMENT OF AD-MINISTRATIVE CLAIM" OF DUN-HILL OF SOUTH TULSA, INC.

MICKEY DAN WILSON, Chief Judge.

On June 27, 1990, Dunhill of South Tulsa, Inc. filed its "Motion for Allowance and Payment of Administrative Claim." On July 11, 1990, Patrick J. Malloy III, Trustee, filed his "... Objection ..." thereto. At hearing on August 3, 1990, evidence was introduced and received, and the Court took the matter under advisement, also requesting further statements and briefs from counsel. Said written statements and briefs were submitted on August 6, 1990 and August 7, 1990. Upon consideration thereof, and of the record herein, the Court, pursuant to Bankruptcy Rules 9014 and 7052, finds, concludes, and orders as follows.

## FINDINGS OF FACT

First Security Mortgage Company ("First Security") was engaged in the business of making and servicing loans secured by real estate mortgages. First Security was approved and acted as a Government National Mortgage Association (GNMA) issuer under the auspices of the United States Department of Housing and Urban Development ("H.U.D."), and was approved as mortgagee and acted as agent for the Federal Housing Administration (FHA), itself an agency within H.U.D. First Security's activities under the auspices of H.U.D. formed an important part of First Security's business.

At an unspecified time before October 8, 1989, First Security engaged Dunhill of South Tulsa, Inc. ("Dunhill") to perform certain services for First Security. Dunhill is in the business of finding and placing potential employees for would-be employers. First Security then maintained a large number of unprocessed loans or loan applications, and engaged Dunhill to find a "loan closer" who would work for First

Security in catching up on this substantial backlog. In Dunhill's line of business, "it is the custom of trade that fees for placement accrue and are payable on the date a placed employee begins work. Fees are contingent upon successful placement," Dunhill's ex. no. 1.

On October 8, 1989, First Security filed its voluntary petition for relief under 11 U.S.C. Chapter 11 in this Court.

At an unspecified time after October 8, 1989, an officer of Dunhill learned of First Security's entry into reorganization proceedings under Chapter 11. Dunhill's officer spoke by telephone with an officer of First Security, inquired specifically about the pending engagement to find a loan closer for First Security, and asked (in effect, whether or not in these words) if First Security's bankruptcy "made any difference." First Security's officer replied (in effect, whether or not in these words) that Dunhill should "go ahead" with its search for a loan closer.

Dunhill procured a potential loan closer, one Leslie Larson, who was accepted for employment by First Security and who commenced employment on or about November 6, 1989.

On November 13, 1989, First Security filed its statements and schedules pursuant to 11 U.S.C. § 521(1) and Bankruptcy Rule 1007, reporting, among other things, total assets of $12,899,692.00 and total debts of $14,148,694.30 for a net deficit of assets under debts of over one million dollars.

On November 16, 1989, Dunhill sent First Security an invoice for $7,128 for Dunhill's services in procuring Larson. According to said invoice, the fee of $7,128 was calculated by taking 27% of a stated amount of "$26,400 per year" which apparently represents the salary First Security would pay Larson during her first year on the job as loan closer. The amount of $7,128 was to be divided equally between two "counselors," apparently agents or employees of Dunhill, named "Larry" and "Bob." The original contract of employment whereby First Security hired Dunhill and presumably agreed to certain payment terms does not appear in the record before the Court; but none of the parties have suggested that the invoice with its charge of 27% of $26,400/year = $7,128 deviated in any respect from the agreement of the parties.

On December 13, 1989, H.U.D. filed its "Emergency Motion for Relief From Stay" in this Court, seeking permission to terminate First Security's activities as H.U.D.'s approved GNMA issuer and approved mortgagee and agent for FHA. Said motion was granted by order filed December 15, 1989.

On March 15, 1990, Patrick J. Malloy III was appointed Trustee ("the Trustee") of First Security's Chapter 11 case and estate.

When the Trustee took office, he found no employees working for First Security at its former business. Larson could not have worked for First Security as loan closer for any period longer than four (4) months.

### CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), 11 U.S.C. § 503(b).

The facts and issues may be summarized as follows. First Security, debtor in Chapter 11, was in the business of making and servicing loans secured by real estate mortgages. Dunhill is an employment agency which located a "loan closer" who was hired by First Security; but for other reasons First Security's loan business was terminated and the loan closer's useful employment cut short after only four months on the job. First Security's business having collapsed, a Trustee was appointed in the case. Dunhill now seeks payment of $7,128 as a priority administrative expense for its services in locating the loan closer hired by First Security; the Trustee objects. Dunhill may claim administrative expense priority either as a cost of preserving the estate under 11 U.S.C. § 503(b)(1)(A), or as a professional person's fee under 11 U.S.C. § 503(b)(2). The Trustee proposes that, since Dunhill's fee is calculated merely as a percentage of the loan closer's yearly salary, it should be reduced in proportion to the actual four month term of employment of this loan closer in order to

qualify under § 503(b)(1)(A); but, if Dunhill is a "professional person," Dunhill's failure to obtain prior court approval of its own employment under 11 U.S.C. § 327(a) forfeits the fee to which it might have been entitled under 11 U.S.C. § 503(b)(2).

Were this a contractual claim against a solvent mortgage company outside bankruptcy, there would be little question that Dunhill is entitled to the full amount of its fee. But "Reorganization, in its fundamental aspects, involves the thankless task of determining who should share the losses incurred by an unsuccessful business and how the values of the estate should be apportioned among creditors," S.Rep. No. 95–989 (1978) p. 10, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5796; and see *In re Mid Region Petroleum, Inc.,* 111 B.R. 968, 972 (B.C., N.D.Okl.1990). To the extent one creditor's losses are mitigated by giving it a prior claim on inadequate estate assets, other creditors' losses will be aggravated, *id.* In such unfortunate circumstances, "expressions of priority ... are expressions of policy," 3 *Collier on Bankruptcy* (15th ed.1990) ¶ 503.03 p. 503–15. The basic policy is that "administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization," *In the Matter of Jartran, Inc.,* 732 F.2d 584, 588 (7th Circ.1984); and see *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Circ.1976).

11 U.S.C. § 503(b)(1)(A) grants priority to "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." In applying this subsection, courts inquire whether

> the debt both (1) "arise[s] from a transaction with the debtor-in-possession" and (2) is "beneficial to the debtor-in-possession in the operation of the business." *In re Mammoth Mart, Inc.,* 536 F.2d at 954. This test is, of course, essentially an effort to determine whether the underlying statutory purpose will be furthered by granting priority to the claim in question, and we will apply it in that spirit,

*In the Matter of Jartran, Inc.,* supra, 732 F.2d p. 587. So will we.

The *Jartran* case turned on the first part of the test, namely, whether the debt arose from a transaction with the debtor-in-possession. In that case, services were performed and advertisements published by an advertising agency after the advertiser-principal had entered bankruptcy. The 7th Circuit observed,

> We recognize that the services performed by appellants after the closing date, and after the filing of the petition, were significant and of value to Jartran. However, appellants do not allege that Jartran, after the filing of the petition, requested that appellants continue work on ads for which the closing date had passed ... Thus, it was the pre-petition Jartran and not Jartran as debtor-in-possession that *induced* appellants to perform these services. To serve the policy of the priority, inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor
>
> ...
>
> As noted, the reason that *inducement* of the creditor's performance by the debtor-in-possession is crucial to a claim for administrative priority is rooted in the policies that gave rise to the creation of the priority,

*In the Matter of Jartran, Inc.,* supra, 732 F.2d pp. 587–588. In the case now before this Court, it appears that Dunhill learned of First Security's bankruptcy before completing its contractual engagement to locate a loan closer, inquired of First Security's officer whether the bankruptcy would "make any difference," and was urged to "go ahead," whereupon Dunhill completed its engagement and found a loan closer who was in fact hired by First Security. The "inducement" part of the test is thoroughly satisfied in this case.

This case turns on the second part of the test, namely, whether the debt incurred to Dunhill was beneficial in the operation of First Security's business. The Court ob-

serves that First Security's reorganization attempt made the need to reduce its backlog and maximize its productivity more important than ever, and hiring this loan closer was an essential part of that effort. However, the Trustee points out that Dunhill's fee is based not on the actual time spent or expenses incurred by Dunhill's personnel in finding the loan closer, but on a percentage of the loan closer's first-year salary to be paid by First Security. The Trustee states that "The position of the loan closer could have been filled without the luxury of a $7,000.00 finder's fee," but there is no evidence before the Court to this effect. On the other hand, the Trustee states that he "does not quarrel with the amount of the fee and/or the work performed." It appears to the Court that the Trustee disputes the "benefit" or "necessity" of Dunhill's fee solely because the fee is based on the loan closer's yearly salary and the loan closer did not work more than four months. This Court is not asked to determine what the loan closer should be paid for closing loans, but what Dunhill should be paid for finding the loan closer. Although the loan closer did not finish her job of closing loans, Dunhill did finish its job of finding an acceptable loan closer; and the failure of the loan closer to finish a year's work was neither her fault nor Dunhill's, but was due to First Security's own prior difficulties in management of its affairs. What the Trustee asks the Court to do here is to deny administrative expense priority to an undoubted post-petition debt deliberately incurred in a legitimate attempt to facilitate reorganization, solely because this particular reorganization effort failed. Creditors asked to contribute their efforts toward reorganization would be forced to gamble on the ultimate success of the reorganization as a whole—even if their particular effort was as successful as it could be, they would be at risk if the reorganization later collapsed due to someone else's fault. Such a principle would not induce third parties to provide goods and services to debtors attempting reorganization, and would not serve the basic purpose of 11 U.S.C. § 503(b)(1)(A). This Court will not rubber-stamp any post-peti-

tion contract; reduction of Dunhill's fee herein might be contemplated if there were evidence that the fee itself is abnormally high, or that the fee amount in fact bears no relation to the services performed by Dunhill, or that Dunhill did its job poorly and provided the estate with an unsatisfactory employee, or even that such fees are customarily modified if the "placed" employee's position must be prematurely terminated. There is no such evidence in this contested matter. Dunhill's services conferred a signal benefit on this estate, prospectively at least; and there is no evidence that the fee charged for such services is excessive. The circumstances of this case do not indicate sufficient reason to reduce Dunhill's fee retrospectively.

*In re Amarex, Inc.*, 853 F.2d 1526 (10th Circ.1988) awarded administrative expense priority under § 503(b)(1)(A) to only that part of a "guaranteed annualized bonus" of $10,000 which was attributable to services performed post-petition. Despite its characterization as a "bonus," the $10,000 sum "was part of [the employee's] annual salary, and was earned day by day during that first year," *id.* p. 1531. Dunhill's fee herein was not "earned day by day," and was not earned at all until Dunhill had procured a loan closer acceptable to First Security—which occurred post-petition and on First Security's post-petition inducement.

11 U.S.C. § 503(b)(2) grants priority to "compensation and reimbursement awarded under section 330(a) of this title." 11 U.S.C. § 330(a) provides in pertinent part that

... subject to section ... 328 ... of this title, the court may award ... to a professional person employed under section 327 ... of this title, ...

(1) reasonable compensation for actual, necessary services rendered by such ... professional person ... and by any paraprofessional persons employed by such ... professional person ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 328 in turn provides in pertinent part that

(a) The trustee ... may employ or authorize the employment of a professional person under section 327 ... of this title ... on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 327 in turn provides in pertinent part that

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons ... to represent or assist the trustee in carrying out the trustee's duties under this title.

(b) If the trustee is authorized to operate the business of the debtor under section ... 1108 of this title, and if the debtor has regularly employed attorneys, accountants, or other professional persons on salary, the trustee may retain or replace such professional persons if necessary in the operation of such business ...

The trustee's duties are recited in 11 U.S.C. §§ 704, 1106(a). Reference to "the trustee" includes, for most purposes, a debtor-in-possession, 11 U.S.C. § 1107. This complex of statutes provides essentially as follows: "professional persons" are an exception to the general application of 11 U.S.C. § 503(b)(1)(A), and are given special treatment under other statutes; they are hired by the trustee or debtor-in-possession to assist in carrying out duties imposed by the Bankruptcy Code, with the Court's approval, under 11 U.S.C. § 327(a); they are hired on salary in the regular course of debtor's business, without need for Court approval, under 11 U.S.C. § 327(b); and no matter how they are hired, they are paid in accordance with 11 U.S.C. §§ 328, 330 and to that extent are given administrative expense priority pursuant to 11 U.S.C. § 503(b)(2). The term "professional person" is not defined by any provision in the Bankruptcy Code.

The Trustee proposes that Dunhill is a "professional person;" that, moreover, Dunhill is a "professional person" of the sort described in 11 U.S.C. § 327(a) whose employment must be "with the Court's approval;" and that Dunhill's failure to obtain Court approval of its employment by First Security *before* completing its assignment post-petition subjects Dunhill to total or partial loss of any fee to which it would otherwise have been entitled.

What is a "professional person" within the meaning of § 327(a) is not clear. A long line of cases commencing with *In the Matter of Seatrain Lines, Inc.*, 13 B.R. 980 (B.C., S.D.N.Y.1981) holds that

... In the context of a debtor proceeding, persons in occupations ordinarily considered professions are not necessarily professionals whose retention by the estate requires court approval. For the purposes of section 372(a), "professional person" is limited to persons in those occupations which play a central role in the administration of the debtor proceeding. Court approval is required for the retention of attorneys, accountants, appraisers, auctioneers and persons in other professions intimately involved in the administration of the debtor's estate,

*id.* p. 981. Such cases do not recognize as "professional persons" under § 327(a) those who are involved in the "mechanics of [debtor's] operation," no matter how "important" their "role" may be in the outcome of reorganization, *id.* This approach, resting on such vague notions as "central," "intimate," "administration" and "mechanics," has been criticized as "difficult to apply and subject to arbitrary and inconsistent results, particularly when employment is sought early in a case and the

degree of future participation is unknown," *In re Fretheim*, 102 B.R. 298, 299 (B.C., D.Conn.1989). An alternative test has been proposed, as follows:

> ... For § 327(a) to be applicable, an employee's function must be related to the administration of the debtor's estate ... ("[P]ersons with such a tangential relationship to the administration of the [debtor's] ... estate do not fall within the rubric of 'professional persons' in § 327(a)."). But once that predicate has been established ... it must be determined whether an employee is to be given discretion or autonomy in some part of the administration of the debtor's estate ...
>
> ... [F]or example, approval must be sought for the employment of a person with a relatively small task but a large measure of discretion in performing it but not sought for a person who is to perform an important but nondiscretionary task,

*id.* However, this test, resting on such notions as "related," "administration," "tangential" and "discretion," offers no great improvement in clarity and ease of application; and perhaps concentrates too much on what is "professional" in the abstract, to the neglect of § 327(a)'s emphasis on "carrying out the trustee's duties under this title."

Dunhill is not one of those types of professionals—"attorneys, accountants, appraisers, auctioneers"—specifically mentioned in § 327(a); if Dunhill is a professional at all, it must be one of those "other professional persons" so vaguely referred to in the statute. Whether Dunhill's location of a loan closer "assist[ed First Security] in carrying out [a debtor-in-possession's] duties under [title 11]" depends on how broadly or narrowly this Court construes a debtor-in-possession's duties under title 11, and on which of the abovementioned tests offered by case law this Court adopts and how this Court applies it to the facts at hand. Dunhill's status as a "professional person" of the sort subject to § 327(a) is uncertain and debatable.

Some courts have purported to deny all compensation, no matter how valuable the services rendered or how innocent the infraction, when court approval was not obtained *before* the employment commenced or the services were rendered; see *In re Windsor Communications Group, Inc.*, 54 B.R. 844 (B.C., E.D.Penn.1985). 11 U.S.C. § 330(a), read literally, indicates that compensation is owing only to one who is "employed" under § 327; and § 327(a) makes it clear that employment must be approved at some time by the Court; but none of the statutes here involved provide in so many words that compensation is owing only where the Court's approval has been given *in advance* of employment. Automatic disallowance of any fee no matter what the circumstances is not only uncalled-for by the statutory language but unjustifiable in equity and insupportable as a matter of policy. In equity, it is apparent that such a rule tends to confer an unjust enrichment on the estate which has received valuable services without having to pay anything for them, and inflicts a substantial penalty for a "wrong" that may be merely technical in nature, innocent in intention, and otherwise harmless in effect. A court of equity is seldom justified in disregarding *quantum meruit.* As a matter of policy, it is apparent that so ferocious a penalty goes beyond what is needed to guard against the occasional "officious intermeddler or ... gratuitous volunteer," 2 *Collier on Bankruptcy* (15th ed. 1990) ¶ 327.02 p. 327–7, and see *In re King Electric Co., Inc.*, 19 B.R. 660 (E.D.Va.1982); and will make a discreet provider of services avoid a bankruptcy case as he would avoid a minefield, thereby defeating the underlying policy of encouraging post-petition support for entities attempting to reorganize. The rule of automatic, invariable and total forfeiture of fee is made all the more inappropriate in cases such as the present one by the difficulty of deciding who is or is not a "professional person" subject to § 327(a)—this is a terrible thing to do to one who has given good service in good faith merely because his opinion on an obscure and difficult point of law differs from that of the judge. This Court is

under the impression that bankruptcy is essentially an exercise in intelligent equity, albeit regularized by Congressional enactments, *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966); *Securities & Exchange Comm. v. United States Realty & Improvement Co.,* 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). There is no place in such a scheme for so savage a rule.

No doubt the better practice is to obtain prior Court approval wherever there is doubt. Where such prior approval is not obtained, the Court may consider the failure to obtain it as a factor bearing on denial of fees; but where circumstances warrant the Court may also grant *nunc pro tunc* approval. Accord, *In the Matter of Triangle Chemicals, Inc.,* 697 F.2d 1280 (5th Circ.1983). Even if approval is denied, the Court might award some sum in *quantum meruit,* although such an award would not satisfy the requirements of §§ 327 et seq. and therefore would not be entitled to priority under § 503(b)(2).

█ Indeed, it appears to the Court that the Trustee actually proceeds along much the same approach to the problem. The Trustee characterizes Dunhill as a "professional person" within § 327(a) and Dunhill's fee agreement with First Security as a "contingency fee," and argues for disallowance and non-priority status of the fee not only because of the failure to obtain prior Court approval but also because of the nature of the fee as a contingent percentage bearing no necessarily close relation to the services performed and the retrospective disproportion between the twelve-month basis of the fee and the four-month benefit realized by the estate.

For purposes of this opinion, this Court will accept the Trustee's propositions that Dunhill is a "professional person" within 11 U.S.C. § 327(a) and that Dunhill's employment was "on a contingent fee basis" within 11 U.S.C. § 330(a). Dunhill's employment on this basis by First Security was not approved by this Court; but, given Dunhill's own innocence of any demonstrable wrongdoing, Dunhill's reliance on First Security's express invitation to continue the employment arrangement, the specific, determinate, non-continuing nature of Dunhill's assigned task (which did not threaten continuous and ever-mounting costs chargeable to the estate), the usefulness of the task (as it appeared at the time) in assisting First Security's attempt to reorganize, the absence of any indication of abnormality in the method of calculation of the fee, and the debatable nature of Dunhill's status as a "professional person" of the sort whose employment requires approval under § 327(a), this Court hereby approves Dunhill's employment *nunc pro tunc.* Therefore, pursuant to 11 U.S.C. § 330(a), Dunhill is entitled to award of compensation for its services as provided in its contingency fee agreement unless "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." Whether the termination of First Security's relationship with H.U.D., and the consequent sudden collapse of its business, were "capable of being anticipated at the time" Dunhill was hired, or at the time First Security accepted Dunhill's "found" loan closer, does not clearly appear. Nor does it clearly appear whether the $7,128 fee is so excessive in amount or disproportionate to Dunhill's actual efforts and First Security's actual benefits as to qualify as "improvident." Under these circumstances, the conditions which permit modification of the fee are not established; and so the fee stands unmodified.

Dunhill is entitled to allowance of its claim in the amount of $7,128.00 as a Chapter 11 administrative-expense priority claim under either 11 U.S.C. § 503(b)(1)(A) or 11 U.S.C. § 503(b)(2). Dunhill is entitled to payment of its claim, provided that other claims of at least equal priority are not thereby prejudiced. To that extent, Dunhill's "Motion for Allowance and Payment of Administrative Expense" is hereby granted.

AND IT IS SO ORDERED.