In re Alfred E. BURKE and Virginia J. Burke, Debtors.

Bankruptcy No. 88–03903–W.

United States Bankruptcy Court, N.D. Oklahoma.

Dec. 7, 1992.

ined to determine the nature of the award.

Lonnie D. Eck, Tulsa, Okl., for trustee.

Arens and Alexander, Fayetteville, Ark., for debtors.

## ORDER

### GRANTING IN PART AND DENYING IN PART

### ARENS AND ALEXANDER'S "APPLICATION FOR APPROVAL

### OF EMPLOYMENT OF ATTORNEY ...,"

### TRUSTEE'S "... MOTION TO REVIEW TRANSACTIONS WITH ATTORNEYS

### AND FOR RETURN OF PAYMENTS"

### AND

### ARENS AND ALEXANDER'S "... APPLICATION FOR ALLOWANCE OF FEES

### AND REIMBURSEMENT OF OUT-OF-POCKET EXPENSES ..."

MICKEY DAN WILSON, Bankruptcy Judge.

The Trustee in this case moved for review of debtors' transactions with their at-

torneys and for return of payments made by debtors to their attorneys. Said attorneys objected to the Trustee's motion(s), and in turn made application for allowance of their fees and expenses. After hearing, these matters were taken under advisement. Upon consideration of evidence introduced and received, and of the record herein, the Court, pursuant to F.R.B.P. 7052 and 9014, finds, concludes, and orders as follows. Details of procedural history are included among "Findings of Fact."

## FINDINGS OF FACT

Alfred E. Burke and Virginia J. Burke are husband and wife ("Mr. Burke;" "Mrs. Burke;" "the Burkes;" "debtors"). Mr. Burke has been a farmer since 1952. The details of Mr. Burke's operations before mid–1987 are obscure. He appears to have leased some realty from one Bob Edmiston, and apparently did not entirely satisfy his landlord's demands for rent. In 1985 and 1986, Mr. Burke borrowed heavily from Farmers' Home Administration ("FmHA") as "operating loan[s]" to pay for "[e]quipment and [c]attle," schedule A–2. Like many farmers, Mr. Burke relied heavily on non-farming sidelines. Mr. Burke hauled trash in a truck, which earned him $24,502 in 1986, and $38,440 in 1987.

In 1987, the Burkes took over a dairy farm in Mayes County, near Pryor, Oklahoma. The Burkes leased the farm itself, a 640–acre tract with farm buildings including dairy barn and dwelling, from Dean and Deborah Ringling ("the Ringlings"). The Burkes leased a nearby tract of 297 acres from Velma Brown ("Mrs. Brown"). These leases would expire in April and June of 1990. The Burkes purchased fee simple title to another tract of approximately 360 acres, borrowing the purchase price from First Alabama Real Estate Financing Inc. in Montgomery, Alabama ("First Alabama"). The Burkes purchased the Ringlings' dairy herd of 125 Holstein cows on credit for $50,000; and borrowed substantial sums from Citizens Security Bank, as further "operating loan[s]" for "[c]ows and equipment," schedule A–2.

Most of the Burkes' property, real and personal, was collateral for secured debts. First Alabama had a mortgage on their real estate held in fee; their cattle, machinery and equipment were subject to various security interests in favor of FmHA, Citizens Security Bank, CMC Trailer, John Deere, Navistar Financial Corp., and Mid America Dairymen, Inc. Their only unencumbered asset of substantial value appears to have been Mr. Burke's trash-hauling truck.

When Mr. Burke was occupied hauling trash, Mrs. Burke supervised the farm, sometimes with the help of her daughter.

The enterprise did not prosper. By late 1988, the Burkes were under severe financial and legal pressure. They were raising cash by the desperate expedient of selling some of their cattle, without regard to whose collateral the animals might be, and without accounting for the proceeds. They had lost some farm equipment to attachment by their former landlord, Bob Edmiston. They had suffered adverse judgment in at least one lawsuit, *Northwestern Oklahoma Dairy Supply v. Burke.* They were defendants in at least three pending civil suits, namely *Lincoln Co. Center v. Burke*, No. C–88–355 in the District Court of Lincoln County, Oklahoma; and *Western Feed Mills v. Burke*, No. C–88–403, and *American Family Life Assurance Co. v. Burke*, No. C–88–449, in the District Court of Mayes County, Oklahoma. The lawsuits by Lincoln Co. Center and Western Feed Mills involved the Burkes' purchase of cattle feed with rubber checks; and the Burkes feared that these plaintiffs might also bring criminal charges against them.

In September 1988, the Burkes sold their trash-hauling operation to Mr. Burke's nephew for $28,500.00. Whether the Burkes sold a "route," or a trash-hauling truck, or some combination thereof, is not clear. Then, or soon thereafter, the Burkes consulted attorneys in Fayetteville, Arkansas. On October 3, 1988, the Burkes signed a letter of engagement, addressed to John F. Arens of the law firm of Arens

and Alexander ("A & A"), which read as follows:

> We wish to retain you and your firm to represent us in resolving our indebtedness through a Chapter 12 proceeding or any other method as you feel appropriate and to defend us if necessary against charges which may be brought in Mayes County, Oklahoma under Oklahoma Statute 21 § 1541.1 et seq. In that connection, we have this day paid you a nonrefundable retainer in the amount of Twenty Thousand Dollars ($20,000). We understand that these will be the only dollars required of us and that you will fully litigate this case.
>
> It is further understood that if any recovery is made over and above debt adjustment or satisfaction, that our expenses including the above retainer, and your firm's out-of-pocket expenses, will be deducted and only thereafter will any net recovery be shared on the basis of sixty percent (60%) to us and forty percent (40%) to your firm,

A & A's ex. # 1, hrg 11/30/89. The $20,-000 "non-refundable retainer" was paid to A & A from the proceeds of the sale of Mr. Burke's trash route and/or truck.

On December 20, 1988, the Burkes filed their voluntary petition for relief under 11 U.S.C. Chapter 12 in this Court. Their case came under the supervision of Lonnie D. Eck, Standing Chapter 12 Trustee in this District ("the Trustee").

The Burkes' petition was signed by David G. Nixon ("Nixon") for the law firm of A & A. Nixon signed most of the pleadings later filed, and made most of the court appearances, on behalf of the Burkes. Neither Nixon individually nor the law firm of A & A requested this Court's approval of their employment as attorneys for the Burkes pursuant to 11 U.S.C. § 327(a). On January 30, 1989, one Terry A. Zelinski of the law firm of A & A made her individual application for permission to practice *pro hac vice* before this Court, which said application was granted on February 2, 1989. Neither Nixon individually nor the law firm of A & A made any such application.

With the petition, Nixon for A & A filed a "Disclosure of Compensation Paid or Promised to Attorney for the Debtor" pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b). This document declared that debtors had "Paid $7,500.00" from "Sale of unencumbered assets" and had "Promised $-0-." The statute requires disclosure of compensation for services "rendered *in contemplation of or in connection with* the case;" but A & A's pre-printed form of disclosure purported to disclose compensation only for services "rendered or to be rendered *in* this case" (emphases added).

Schedules and statements which are not filed with the bankruptcy petition are due within 15 days thereafter, Bankruptcy Rule 1007(c). Debtors filed their statement of financial affairs and schedules on January 17, 1989. Amendments and supplements thereto were filed as late as February 24, 1989. These documents showed priority debts for wages and taxes, mostly the latter, of $2,695.77; a debt to First Alabama for $442,765.78, secured by tract 3 valued at only $250,000; other debts totalling about $280,000 secured by collateral whose value was not stated; and general unsecured debts of $137,753.08. Debtors reported personal property consisting of cattle valued at $164,425.00; machinery and equipment valued at $116,820.00; and miscellaneous other items valued at approximately $34,000, including cash on hand of only $100.00 and deposits of zero. Debtors claimed exemption of items valued at $21,-950. In summary, debtors reported debts totalling $864,818.58 and assets totalling $565,285.00, for a negative net worth of almost $300,000.00. Debtors also reported current income of $24,000 per month and expenses of $1,942.91 per month.

Although A & A's disclosure of compensation reported receipt of only $7,500 from debtors, debtors' own Statement of Financial Affairs # 20.b. reported payment of $20,000.00 to A & A.

Case administration proceeded for some time in a routine manner. On January 31, 1989, a meeting of creditors was held, without remarkable incident. On the same day, debtors commenced an adversary proceed-

ing to recover some items of property from allegedly overzealous creditors. On February 14, 1989, debtors moved for valuation of secured claims, a necessary preliminary to construction of a Ch. 12 plan. On February 22, debtors moved to assume their lease with Mrs. Brown, to reject their lease with Ringling, and for permission to negotiate with FmHA (in the nature of a comfort order, as requested by FmHA itself). Various creditors entered appearances and made motions and objections of no special urgency.

Meanwhile, debtors' cattle were dying of starvation and exposure. On about February 20, Mrs. Brown complained to the sheriff about the condition of her neighbors' cattle. On February 22, FmHA's agent Stephen D. Gregory visited debtors' farm. He saw a dozen cows and calves dead or dying. The rest stood outdoors in frozen mud, "emaciated and starving," affidavit of Gregory attached to pleading #31. Gregory fetched a veterinarian, Dr. Fell. Fell determined that the animals still living were "extremely emaciated and weak ... in a severe state of emaciation and malnutrition," statement of Dr. Fell attached to pleading #31. He saw calves eating their own excrement. Others nibbled at his clothes.

FmHA contacted the U.S. Attorney's Office in Tulsa, Oklahoma. On February 23, 1989, the U.S. Attorney for FmHA filed an "Emergency Motion for Turnover of Collateral to FmHA," seeking immediate recovery of such cattle as were still alive, without waiting to determine which animals were subject to whose security interest. The Court forthwith ordered that debtors' cattle "be turned over to FmHA for safekeeping, custody and care, pending further order of this Court." That same day, FmHA's agents returned to debtors' farm, with trucks and trailers. They found that two more cows had collapsed. Three of the previously-dead animals had been moved; the others lay where they had fallen. One was starting to bloat.

By then, a local reporter was on the scene. He saw the cattle on debtors' premises, most of them fenced in a muddy "pasture" which was "barren of grass or other food." He watched as FmHA's agents herded cattle onto trailers, while "one [cow] lay in convulsions a few feet from another cow too weak to move." He heard a deputy sheriff say there was "no cattle food on the farm except rotten hay." He ascribed the following remarks to Mr. Burke: that the dead cattle had died of pneumonia; that "They just couldn't take" the cold weather; that they were admittedly undernourished, having had no grain "since late August when a tornado blew the farm's feed bins over;" that "All th[e surviving animals] need is grain and worming;" that "about a month ago" Burke had proposed selling some cattle for money to buy grain and worm medicine for the rest, but his attorneys had told him he could expect to go to jail if he sold one cow; and that FmHA "is trying to steal those cattle." See "Starving Cattle Taken From Farm," *The Daily Times*, Pryor, Oklahoma, Vol. 56 No. 40, Feb. 24, 1989.

The Court convened a hearing on the matter on February 28, 1989. With debtors' agreement, the Court ordered that FmHA should keep and care for all of the cattle, with costs to be adjusted later among the various secured creditors whose interests were thus protected. The Court set all other pending motions for hearing on March 9, 1989. Two days before the hearing, FmHA moved for relief from stay to sell some of its collateral (cattle and equipment); and also moved for conversion or dismissal of the case. One day before the hearing, debtors moved for permission to spend whatever money FmHA obtained from selling its collateral, "to pay essential family living and farm operating expenses."

At hearing on March 9, 1989, the Court received evidence on the history and condition of debtors' farm. Among other things, it appeared that the Oklahoma State Health Department had cited debtors for their farm's deficient sanitation and overabundant manure, rodents and insects; and that debtors had continued milking their cows after they stopped feeding them—even though the starving animals' milk production had dropped by more than

nine-tenths. After hearing the evidence, the Court removed the Burkes as debtors-in-possession pursuant to 11 U.S.C. § 1204(a). The Burkes' removal was announced by the Court "from the bench" and was effective immediately (though a written order was not filed and entered until March 14, 1989). FmHA's motion to convert or dismiss was continued to be reset by the Court.

Also on March 9, 1989, Nixon for A & A filed a "First Amended and Restated Disclosure of Compensation ..." This document declared that debtors had "Paid $17,-500.00" and "Promised $–0–." At the same time, debtors by Nixon filed an "Application for Approval of Employment of Attorney Under A General Retainer." This document requested, for the first time, that A & A's employment as attorneys for debtors be approved by the Court. The document stated that "No Order of this Court has been entered removing the Applicants as Debtors–in–Possession." It was drawn in all respects as an application for approval of attorneys to advise debtors-in-possession as to their current and future rights and duties in administering a Ch. 12 case, and made no mention in its title or text that it was intended to operate *nunc pro tunc*—except that p. 3 ¶ 7 and the final prayer both contained the phrase, "effective as of December 20, 1988." It stated that "[debtors] paid [A & A] the sum of $17,500.00 as a non-refundable general retainer to secure the representation of the firm, for the purpose of prosecuting a Chapter 12 bankruptcy proceeding." It asked for approval of employment "pursuant to and under a general retainer on the terms and conditions recited above," and also "That the costs of said employment be treated as an administrative expense under 11 U.S.C. § 503(6)." The Court never granted this application.

The Trustee, observing discrepancies among various statements of amounts paid to A & A, filed on April 19, 1989 his "Motion to Review Transactions With Attorney and For Return of Payments." He asked

> that the Court require [A & A] to file a detailed, itemized statement of all compensation paid or agreed to be paid in contemplation of or in connection with

this case and the source of such compensation ... [and] that the Court determine the reasonable value of services performed and to the extent the compensation paid exceeds such reasonable value, order payment of the excess to the ... Trustee.

This motion was set for hearing on April 25, 1989.

During March and April of 1989, debtors' dairy operation was dismantled. Farm leases were rejected; cattle and equipment were sold, repossessed or abandoned. On March 20, 1989, debtors filed a Ch. 12 plan, which proposed to reorganize by growing alfalfa hay on debtors' remaining acreage and hauling coal. Debtors asked and were allowed to regain possession of three vehicles which were necessary to these operations. On April 17, 1989, debtors filed an amended plan, which proposed to discontinue farming altogether and announced that Mr. Burke "will be driving a truck for Kroblin Trucking." Debtors proposed to keep the aforementioned three vehicles, although they apparently had no further need for them. The amended plan continued to refer to the prospective truck driver as "Farmer." A confirmation hearing was set—but the Court, on its own motion, set at the same time a hearing to consider debtors' eligibility for Ch. 12; and also reset FmHA's previous motion to convert or dismiss. On April 20, 1989, the Trustee filed his own motion to dismiss the case. These and other matters came on for hearing on April 25, 1989.

By April 25, 1989, debtors had filed three monthly reports on their operations during Ch. 12. The first reported income of $3,363.96 from milk sales and a $500 loan, and expenses of $4270.80, for a net loss of $406.84. The second reported income of $2,080.53 from milk sales and expenses of $2092.95, for a net loss of $12.42. The third reported income of $100 from sale of a calf, $194.43 from milk sales, and $3,988.52 from "outside work" (of which $3,000 was actually a loan from Citizens Security Bank), and expenses of $4319.37, for a net loss of $36.42.

At hearing on April 25, 1989, the Court received evidence of debtors' unauthorized and irregular sales of collateral and disposition of the proceeds thereof. The Court further heard testimony about the condition of debtors' hayfields ("relatively poor condition ... weeds and stubble on them," transcript p. 20 lines 6–13), ponds ("wet spots in the field," transcript p. 33 line 3), and machinery:

> ... very little of it in field-ready condition. Most of the major implements, the tractors, were in need of repair; two of them w[ere] unable to run, one ... had been dismantled, the other ... the power shift or the transmission was out of it ... the third tractor ... had a flat tire and it had the appearance that it had been driven on this flat tire until the tire was separated from the rim,

transcript p. 6 lines 15–25. The Court also received evidence of inaccuracies and inconsistencies in debtors' oral and written statements made in the course of administration of the case, of which the most important were as follows: debtors had provided conflicting or inadequate information concerning various pre-petition transfers, especially the sale of the "trash route" and/or truck and disposition of the proceeds, including payments to their attorneys; and had claimed current monthly income of $24,000 when their actual current income was near zero. The Court determined that "this is not a farm plan," transcript of ruling p. 8 line 1, so dismissal or conversion to some other chapter was necessary; that reorganization under any chapter requires "an honest debtor ... who understands what is expected of him ... who will follow directions and not attempt fraudulent activities," transcript of ruling p. 9 lines 4–7; that the Burkes' destructiveness, incompetence, and untrustworthiness unfitted them for reorganization under any chapter; that, nevertheless, the Burkes' financial distress invited some form of bankruptcy relief; and that, accordingly, their case should be converted from Ch. 12 to Ch. 7.

Also on April 25, 1989, debtors, by Nixon for A & A, filed their "Response to Trustee's Motion to Review Transactions With Attorney and For Return of Payments."

In substance (though not in form), said "Response ..." was a motion for approval of professional fees and expenses, with time records attached in the normal manner of a fee application. In this document, A & A requested compensation in the amount of $54,393.75 and reimbursement of expenses in the amount of $4,641.31 for a total award of $59,035.06, of which $20,-000 was to be credited to the retainer already paid by debtors, and the balance of $39,035.06 was to be paid from remaining assets of the estate on a priority basis as an administrative expense pursuant to 11 U.S.C. § 507(a)(1). Because this document was filed on the day of hearing, and because of the urgencies of conversion of the case to Ch. 7, the Court continued the Trustee's motion to review transactions with attorneys and A & A's response thereto, to be re-set on application of the parties or by the Court.

Debtors appealed the order converting their case to Ch. 7. Pending the appeal, litigation continued on creditors' motions for relief from stay and recovery of collateral, and debtors' claims of exemption and motions to avoid liens on property claimed as exempt. Some of these matters were disposed of by Court rulings, others were settled. By and large, Trustee and creditors prevailed over debtors. The appeal was dismissed; debtors obtained exemption of minor items, and in return agreed to pay the Trustee $300.00. This payment was never made. The Trustee declined to press debtors any further.

When last heard of by this Court, debtors were living in a state of demoralized squalor. The Burkes' dogs starved to death on their leashes.

On August 4, 1989, the Court observed that the Trustee's motion to review transactions with attorneys and for return of payments was still pending, and issued its "Order Directing the Escrow of Moneys Paid to Attorneys." Said order directed A & A to "... place into an escrow interest-bearing account the sum of $10,000.00 which ... represents a portion of the fees received by said firm ... and give proof of the same to the Trustee," pending disposi-

tion of the Trustee's motion on application by the parties or order of the Court.

On August 22, 1989, Nixon moved to withdraw as attorney for debtors. He stated that he "is no longer employed by or associated with the law firm of [A & A]," and that "[A & A] will continue to represent the Debtors in this matter. The firm has attorneys who are familiar with this case, who [Nixon] expects will or have already entered their appearance for the continued representation of the Debtors." The only previous entry of appearance had been by Terry Zelinski. No one else ever entered any appearance as attorney for debtors.

On October 31, 1989, the Trustee filed his "Amended and Restated Motion to Review Transactions With Attorney and For Return of Payments." The Trustee stated that he had reviewed the time records submitted by A & A in response to his earlier motion, and believed "that there was some duplication of effort, that certain charges ... were not properly chargeable as attorney time[,] and that the total charges made ... were not compat[i]ble with the results obtained;" that negotiations among the Trustee, the U.S. Attorney's Office and A & A for settlement of the attorney fee issue had been unsuccessful; that A & A had furnished the Trustee with no proof of the present whereabouts of the $10,000 which the Court had ordered escrowed; and that accordingly, the matter should be taken up again by the Court. The Court set the matter for hearing on November 30, 1989.

On November 16, 1989, Terry A. Zelinski for A & A filed a document entitled "Response to Trustee's Motion for Re-Examination of Transactions with Attorneys and Application for Allowance of Fees and Reimbursements of Out-of-Pocket Expenses By Arens and Alexander." This document was apparently intended as an amended response to the Trustee's original motion, or as a response to the Trustee's amended motion; and as a more explicit and formally correct request for allowance of fees and expenses. This document was later supplemented by exhibits offered at hearing on November 30, 1989. The following recitation of time spent and charges made is drawn from the "... Application ..." and supplementary exhibits.

According to the text of the "... Application ...," A & A spent their time representing debtors as follows: 19.75 hours were spent by a single attorney representing debtors in their non-bankruptcy lawsuits between October 3 and December 20, 1988; 118.5 hours were spent by various professional persons "in contemplation of a bankruptcy or other restructure of ... debts" between October 3 and December 20, 1988; and 390.6 hours were spent by various professional persons "[on] this case" after December 20, 1988.

Pre-petition activities included representing the Burkes in their pending lawsuits and making preparations for bankruptcy. Attorney J.D. Moon spent his 19.75 hours answering one complaint and gaining an extension of time to answer another; on the telephone with his clients, the aggrieved plaintiffs, and the Tulsa Police Department; and drafting a notice of bankruptcy. Moon billed $150 per hour for his time; he offered a four-page resume of his extensive legal and business experience, but did not tell the Court the outcome of the civil suits and criminal actions (if any) against debtors. Attorney Terry A. Zelinski spent 29.25 hours at $100 per hour gathering information "to be used in negotiations with creditors toward an informal restructure of debts or for the completion of bankruptcy schedules, if required." Agricultural economists Raymon B. Nance (M.S.) and Michael W. Bonnett (M.S.) spent 85.5 hours at $75 per hour "in interviews with the client, both in the office and at the debtors farm, ... identification of problems in Debtors' current farming operation and development of budgets and cashflows for alternative farm operations ..." Attorney David G. Nixon spent 3.5 hours at $100 per hour "in conferences with Debtors in final preparation for filing the bankruptcy petition." A & A also caused debtors' real and personal property to be appraised, at a cost of $1,073.34.

Post-petition activities involved all of the above-named professional persons, and also unnamed paralegals billing $50 per hour, unnamed law clerks and "Office Personnel" billing $25 per hour, and one Mark House, "investigator," billing $50 per hour. Although the text of the "... Application ..." stated that the total number of hours spent post-petition was 390.60, the time records show more than 400 hours. Of these, at least 246 were spent post-petition but before debtors' removal from possession; at least 135 were spent after debtors' removal but before conversion of the case; and the balance of some 25 hours were spent after conversion of the case. Most of this time was spent by Zelinski (more than 135 hours) and Nixon (more than 140 hours), then by Raymon B. Nance (more than 48 hours) and the paralegal(s) (more than 26 hours). A & A do not provide any breakdown of these hours according to tasks performed. The Court observes numerous charges for "Travel" and "pack[ing] for travel;" and others for non-professional, support-type activities such as "Update Case management," "Service of agreed order," "Preparation of Hearing notebook," "Computer input of documents," and the like. Expenses include unspecified "Travel Expenses."

A & A offer no statement of results obtained. They do state that "Applicant should not be penalized for Debtors' refusal to accept the advise [sic; advice] of the farm experts employed by Applicant which ultimately resulted in unfavorable results for the Debtor[s]," applic. p. 7 ¶ 20.

Despite this attempt to justify the full $59,000–odd in fees and expenses, this "... Application ..." asked for an actual award of only $20,000, i.e. the amount already paid by debtors as a retainer.

At hearing on November 30, 1989, there appeared the Trustee; Terry A. Zelinski and Steve Alexander for A & A; and Catherine Depew, Assistant U.S. Attorney, for FmHA. The Court heard statements of counsel; took judicial notice of certain matters already filed of record; and received evidence, including the letter of engagement signed by the Burkes in October 1988, a statement of professional credentials of members of A & A, and an affidavit of A & A's accounting department manager Rick Norwood.

On December 12, 1989, debtors' Ch. 7 discharge was entered.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (O), 11 U.S.C. §§ 105, 329(b), 330(a), 503(b)(1)(A), (b)(2), 507(a)(1).

■ Debtors paid A & A $20,000 in cash some months before filing bankruptcy. A & A call this payment a "non-refundable retainer." In bankruptcy, there is no such thing as a non-refundable retainer. 11 U.S.C. § 329 makes it clear that any payment, made within one year before bankruptcy to "[a]ny attorney representing a debtor in a case under this title ... for services rendered or to be rendered in contemplation of or in connection with the case," may be reviewed, cancelled and recovered, "to the extent [the payment is found to be] excessive." A & A effectively concede the point, when they ask this Court to approve the retainer and award it to them as professional compensation and reimbursement of expenses.

■ 11 U.S.C. § 330(a) allows payment "to a professional person employed under section 327 ... of this title, or to the debtor's attorney ..." 11 U.S.C. § 327(a) in turn allows employment of professional persons to represent the bankruptcy estate "with the court's approval." § 330(a)'s reference to "the debtor's attorney" may act as a savings provision in Ch. 7 cases, where debtors' attorneys are employed by the debtor, without court approval, not by the estate, with court approval. But it does not negate § 327(a), and does not excuse attorneys in reorganization cases from obtaining court approval for their employment. Without court approval of employment under § 327(a), there can be no right to any compensation or reimbursement of expenses under § 330(a).

Such court approval of employment should be obtained as early as possible in the bankruptcy case.

Where such prior approval is not obtained, the Court may consider the failure to obtain it as a factor bearing on denial of fees; but where circumstances warrant the Court may also grant *nunc pro tunc* approval [of employment],

*In re First Security Mortgage Co., Inc.*, 117 B.R. 1001, 1008 (B.C., N.D.Okl.1990). Circumstances which warrant *nunc pro tunc* approval of employment include uncertainty as to whether a person is a "professional person" within the meaning of § 327(a); innocence and reliance of the purported professional; the nature of the employment, i.e. a "specific, determinate, non-continuing ... task ... which did not threaten continuous and ever-mounting costs chargeable to the estate;" the prospective usefulness of the task in facilitating reorganization; and "the absence of any indication of abnormality in the method of calculation of the fee," *id.*

Here, A & A never obtained this Court's approval of their employment as attorneys for debtors in this Ch. 12 case. A & A did not even ask for approval of their employment until the case was more than three months old. (A request for permission to practice *pro hac vice* by a single member of a firm of out-of-State attorneys is not a request for approval of employment, of the individual attorney or of the firm, under § 327(a).) When A & A finally did ask for approval of employment, they also asked (in an understated manner) for retroactive approval of everything they had done and for commitment to pay everything they asked. The Court refused to grant such a request; and has never granted it to this day. A & A continued their activities nevertheless. Therefore, A & A are entitled to no compensation or reimbursement under § 330(a) at all, unless and to the extent that this Court now, finally, approves their employment under § 327(a) *nunc pro tunc.*

There is no doubt that a law firm about to represent a debtor-in-possession in farm reorganization proceedings is a "profes-

sional person" within the meaning of § 327(a). There is no "innocent reliance" here: these attorneys are self-styled farm-reorganization experts, who either knew the essential conditions of their employment and payment (hence did not rely), or who pretended to an expertise they did not have (hence were not innocent). The nature of their employment was not "specific, determinate, [and] non-continuing;" rather, it was a continuous representation which did "threaten continuous and ever-mounting costs chargeable to the estate," and was precisely the sort of employment for which prior approval under § 327(a) was most necessary. On the other hand, the prospective usefulness of some legal representation to debtors who attempt to reorganize is obvious. And, apart from the supposed non-refundability of the retainer, the fee is calculated by a normal method, multiplying the number of hours spent by specific hourly rates.

The Court does not care to see its supervision of a case impeded and its authority disregarded, especially by attorneys who are supposed to be officers of the Court. The Court believes that A & A's failure to ask for and obtain prior approval of their employment as attorneys for debtors in this case is inexcusable, and that refusal to approve such employment *nunc pro tunc* might well be justified. But the Court is mindful that "a court of equity is seldom justified in disregarding *quantum meruit*," *In re First Security Mortgage Co., Inc.*, supra; and that "the commitment of time and money on behalf of a bankruptcy estate constitutes a powerful equity," *In re Republic Financial Corp.*, 128 B.R. 793, 801 (B.C., N.D.Okl.1991). The Court chooses—not because A & A's neglect was excusable, but merely because the Court prefers to emphasize substance over procedure—to approve A & A's employment as attorneys for debtors under 11 U.S.C. § 327(a), *nunc pro tunc*. However, the Court thereby approves nothing but their employment. The Court does not approve the retainer or any particular activities by these professionals; nor does the Court allow any particular fees, hourly rates, other terms of employment or compensation,

or expenses. Approval of employment under § 327(a) is merely a precondition for approval of these other things, which must be considered separately under § 330(a) and allowed, if at all, thereunder.

 § 330(a) allows "reasonable compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services" outside bankruptcy. A bill submitted by professional persons is payable only to the extent that it is shown to be "reasonable."

> The burden is not for the court to justify each dollar or hour deducted from the total submitted by counsel. It remains counsel's burden to prove and establish the reasonableness of each dollar, each hour, above zero,

*Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir.1986). The Court's determination of whether or to what extent a bill is "reasonable" involves some exercise of discretion, *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40, 52–53; *Mares v. Credit Bureau of Raton*, supra, 801 F.2d pp. 1201, 1210; *In re Republic Financial Corp.*, supra, 128 B.R. p. 800. Accordingly,

> There is no requirement ... that ... courts identify and justify each disallowed hour ... A general reduction of hours claimed in order to achieve what the court determines to be a reasonable number is not an erroneous method, so long as there is sufficient reason for its use ... [S]uch adjustments can take many forms, including a general write-down of total hours logged ... [On appeal] the question resolves itself into whether the ... court abused its discretion ...,

*Mares v. Credit Bureau of Raton*, supra, 801 F.2d pp. 1202–1203.

 There are several reasons why "a general write-down of total hours logged" might be called for. One is that counsel simply wasted too much time doing what he did, *Mares v. Credit Bureau of Raton*, supra, 801 F.2d pp. 1203–1205. Another is "egregious misconduct by the party requesting such compensation and reimbursement," such as "wilful nondisclosure of facts bearing on a conflict of interest," *In re Republic Financial Corp.*, supra, 128 B.R. p. 801. Another is the result, or rather lack of result, of counsel's efforts. In *Ramos v. Lamm*, 713 F.2d 546, 556 (10th Cir.1983), the Court of Appeals of this Circuit held that "the court must focus on the significance of the overall relief obtained ... 'The result is what matters.' ... 'Again, the most critical factor is the degree of success obtained,'" *Ramos v. Lamm*, 713 F.2d 546, 556 (10th Cir.1983) quoting *Hensley v. Eckerhart*, supra, 461 U.S. pp. 435, 436, 103 S.Ct. p. 1940, 76 L.Ed.2d p. 52. *Ramos* and *Hensley* were civil rights cases in which fee awards depended on who was the "prevailing party;" so some caution must be exercised in applying these cases in bankruptcy. Under the former Bankruptcy Act, fee awards were uniformly and arbitrarily reduced according to the so-called "rule of economy," 2 *Collier on Bankruptcy* (15th ed. 1992) ¶ 330.02. This proved a false economy, and was rejected by the present Bankruptcy Code, *id.* Under the present Code,

> As a general rule, professional persons hired with Court approval to work for a bankruptcy estate should be compensated for their services and reimbursed their expenses as would similar professionals doing comparable work outside bankruptcy. This rule serves the policy of encouraging competent administration of bankruptcy cases. Under ordinary circumstances, it also accomplishes simple fairness,

*In re Republic Financial Corp.*, supra, 128 B.R. pp. 800–801. In furtherance of this policy, the Court may consider the value of services from a prospective and not a retrospective viewpoint, *In re First Security Mortgage Co., Inc.*, supra, 117 B.R. pp. 1004–1005. But the Court must act with discretion. "The policy of encouraging proper and skilful administration" must not "serve to excuse improper and wasteful administration," *In re Republic Financial Corp.*, supra, 128 B.R. p. 801.

In this case, A & A's disclosure of its financial dealings with debtors was inaccurate, incomplete, and unsatisfactory. But the Court will not dwell on this factor; for other factors in this case are even more important.

■ Ch. 12 is modelled on Ch. 13; and like Ch. 13 it is supposed to provide prompt, economical relief for debtors of a particular type or class whose total debt is relatively small. See 11 U.S.C. § 101(18), § 109(f); 5 *Collier on Bankruptcy* (15th ed. 1992) ¶ 1200.01[2]–[5], ¶ 1200.04. The bill for attorney services and expenses in this case is almost $60,000.00—equivalent to 5 months of work, 5 days per week, 6 billable hours per day, by one attorney billing at $100 per hour. Such charges, accumulated in only a few months in a small case whose reorganization never got off the ground, are *prima facie* excessive. This general impression is confirmed by examination of the details of this case, with emphasis on the reasonableness of A & A's reported activities in light of the results obtained.

■ The results in this case were hideous. This reorganization did not merely fail—it was put out of its misery, amid scenes of unconscionable brutality. A & A beg this Court not to punish them merely because their clients did not take their advice. This Court will not punish any attorney merely because his client refused to take his advice. But that is not the problem here. A & A's own activities contributed to the ruination of debtors' farm and the mistreatment of debtors' animals.

Debtors' feed bins blew over in August, 1988. At about the same time, debtors were sued for bouncing checks for cattle feed, and came to fear criminal prosecution for the same. For these reasons, in October 1988 they consulted A & A. A & A expected to put debtors in reorganization proceedings, and commenced activities toward that end. But first, A & A demanded a $20,000 cash gift from debtors. To provide it, debtors consumed their last remaining unencumbered asset of any value, and emptied their bank account. It is not surprising that debtors' cattle spent the next few months starving: debtors had no feed for them, and nothing to buy feed with; their last resources had gone to pay their attorneys, for work that had not yet been done and might never be done. When debtors suggested selling some of the cattle to pay for upkeep of the rest, their own attorneys discouraged them. Next, A & A ran up fees of $3,000, for having a $150–per-hour attorney putter with a few collection suits which would be stayed anyway by the filing of bankruptcy; over $6,000 more, for having two agricultural experts bustle about a farm full of starving animals and immobilized machinery, noting sagely that something was amiss; and almost $3,000 more, for collecting inaccurate information for schedules that would be filed late in a "farm reorganization" case which now had no prospect of success.

There is something unreal in such a spectacle. For purposes of this opinion, this Court will presume that A & A actually spent the time indicated in their billing records. But if such time was really spent, then it was spent most unreasonably. A & A's activities bore no rational relation to debtors' actual situation, capabilities or prospects. As the first step in the "reorganization" which they were going to conduct, A & A broke these debtors. The things that followed—the starvation of debtors' animals, the deterioration of debtors' machinery, the recovery of property by secured creditors, the failure of the plan and conversion of the case, debtors' demoralization and destitution—were all consequences of debtors' lack of cash at a crucial time. This lack of cash was A & A's own doing. Is this the kind of "help" offered by reorganization? If it is, all parties would seem to be better off without it—all except A & A themselves.

■ As Mr. Justice Cardozo observed, bankruptcy "is ... an expanding concept that has had to fight its way," *Ashton v. Cameron County Water Improvement Dist. No. One*, 298 U.S. 513, 535, 56 S.Ct. 892, 898, 80 L.Ed. 1309, 1316 (1936) (dissenting opinion). Mr. Justice Cardozo referred to the scope of the Constitutional bankruptcy power itself; but his

**800**

remark also applies to many details of bankruptcy law and administration. The fight is especially furious over the strategic position of attorney for the debtor-in-possession. A debtor-in-possession "is ... a fiduciary and is expected to act like one," *In re Republic Financial Corp.*, supra, 128 B.R. p. 802. He is not permitted to exploit the estate placed in his charge for his own sole benefit, *In re Spoor–Weston, Inc.*, 139 B.R. 1009, 1016–1017 (B.C., N.D.Okl.1992). "The same is true of the debtor-in-possession's attorney," *In re Republic Financial Corp.*, supra. Such an attorney is not expected to work for free. But such an attorney is not expected to treat his client's trust estate as his own grab-bag, either. If such an attorney must exercise some self-restraint at the outset of a case, to leave his client enough cash to keep the business going and make reorganization feasible, then so be it. This may require a debtor-in-possession's attorney to take some risk; but reorganization is a risky business for all concerned. "Congress has not removed all risks from the practice of bankruptcy law," *In re American Resources Management Corp.*, 51 B.R. 713, 721 (B.C., D. Utah 1985).

 In this case, the defective disclosure of compensation, the sheer size of the bill, the terrible results obtained, and the absence of a sufficient explanation and excuse therefor, all indicate that "a general write-down" of fees is called for. However, there are some countervailing factors. Debtors, no doubt by their attorneys' advice, consented to FmHA's removal of the cattle for safekeeping. Debtors were entitled to some sort of bankruptcy relief, and did eventually obtain some exemptions and a Ch. 7 discharge. A & A's preparation of statements and schedules, filing of some pleadings and conduct of some litigation, did contribute thereto. For this, at least, A & A should be compensated. Attorneys are usually entitled to their expenses even when their fees are denied or reduced for egregious misconduct, *In re Republic Financial Corp.*, supra, 128 B.R. p. 806. Moreover, A & A's due compensation and reimbursement of expenses has been long delayed, while this Court kept this matter under advisement; and in such circumstances this Court may resort to an "expedient in lieu of interest," *id.*

 The Court concludes that the most expedient and equitable course is to allow A & A to keep that part of debtors' money they already have, namely some $10,000 paid on retainer and not escrowed by order of this Court—but no more. The $10,000 which was escrowed by order of this Court is not awarded to A & A and must be returned to the Trustee on behalf of debtors' estate, together with all interest accrued thereon. Given the circumstances herein, the Court believes this treatment of A & A to be lenient.

Accordingly, A & A's "Application for Approval of Employment of Attorneys ...," construed as an application *nunc pro tunc*, is granted as to employment itself but is otherwise denied; A & A's "... Application for Allowance of Fees and Reimbursement of Out–of–Pocket Expenses" is granted in the sum of approximately $10,000 not escrowed by order of this Court, as total fees for services, reimbursement of expenses, and compensation for delayed payment of fees and expenses, but is otherwise denied; and the Trustee's "... Motion ... for Return of Payments" is granted in the sum of $10,000 escrowed by order of this Court, together with all interest accrued thereon, which said sum plus interest shall be turned over by A & A to the Trustee forthwith, but is otherwise denied.

AND IT IS SO ORDERED.